## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

| | | |
|---|---|---|
| MADISON SHEWMAKER, JAMAAR FAISON, and CYNTHIA BEEVERS, individually and as a representative on behalf of a class of similarly situated persons, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No: 4:24-cv-00085-CDL |
| YARDI SYSTEMS, INC.; A. J. DWOSKIN & ASSOCIATES, INC.; ALCO ANAGEMENT, INC.; ARDMORE RESIDENTIAL, INC.; RESIDENTIAL, INC.; BALACIANO GROUP; BALKE BROWN TRANSWESTERN, INC.; BANYAN LIVING OHIO LLC; OAKLAND MANAGEMENT CORP. d/b/a BEZTAK MANAGEMENT COMPANY; BRIDGE PROPERTY MANAGEMENT, L.C.; CALIBRATE PROPERTY MANAGEMENT, LLC; CONTINENTAL REALTY COPORATION; DALTON MANAGEMENT, INC.; EDWARD ROSE & SONS; ENVOLVE COMMUNITIES, LLC; FPI MANAGEMENT, INC.; GRUBB PROPERTIES, LLC; GUARDIAN REAL ESTATE SERVICES LLC; HNN ASSOCIATES, LLC; KRE GROUP, INC.;  LUMACORP, INC.; MANCO ABBOTT, INC.; MCWHINNEY PROPERTY  MANAGEMENT, LLC; MORGUARD MANAGEMENT COMPANY INC.; PRG REAL ESTATE MANAGEMENT, INC.; R.D. MERRILL REAL ESTATE HOLDINGS, LLC; RAM PARTNERS, LLC; SINGH MANAGEMENT CO., L.L.C.; SUMMIT MANAGEMENT SERVICES, INC.; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED  FIRST AMENDED CLASS ACTION COMPLAINT |

1

CREEKWOOD PROPERTY                 )
CORPORATION; TOWNE                 )
PROPERTIES ASSET MANAGEMENT )
COMPANY, LTD.; TRIBRIDGE           )
RESIDENTIAL, LLC;  10 FEDERAL      )
MGMT, LLC; & FICTITIOUS            )
DEFENDANTS JOHN DOES 1-100,        )
                                   )
        Defendants.                )

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Madison Shewmaker, Jamaar Faison, and Cynthia Beevers (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, for their Class Action Complaint against Defendants Yardi Systems, Inc. ("Defendant" or "Yardi"), A. J. Dwoskin & Associates, Inc. ("A. J. Dwoskin"), Alco Management, Inc. ("Alco"), Ardmore Residential, Inc. ("Ardmore"), Balaciano Group f/k/a California Home Builders/DEELS Properties ("Balaciano"), Balke Brown Transwestern, Inc. ("2B Residential'), Banyan Living Ohio LLC d/b/a Banyan Living ("Banyan"), Oakland Management Corp. d/b/a Beztak Management Company ("Beztak"), Bridge Property Management, L.C. ("BPM"), Calibrate Property Management, LLC ("Calibrate"), Continental Realty Corporation ("CRC"), Dalton Management, Inc. ("Dalton"), Edward Rose & Sons ("Edward Rose"), Envolve Communities, LLC d/b/a Envolve LLC ("Envolve"), FPI Management, Inc. ("FPI"), Grubb Properties, LLC ("Link Apartments"), Guardian Real Estate Services LLC ("Guardian"), HNN Associates, LLC ("HNN"), KRE Group, Inc. d/b/a Kushner Real Estate Group ("KRE"), LumaCorp, Inc., d/b/a LUMA Residential, Inc. ("Luma"), Manco Abbott, Inc. ("Manco Abbott"), McWhinney Property Management, LLC ("McWhinney"), Morguard Management Company Inc. ("Morguard"), PRG Real Estate Management, Inc. ("PRG"), R.D. Merrill Real Estate Holdings, LLC d/b/a Pillar Properties ("Pillar Properties"), RAM Partners, LLC ("RAM'), Singh Management Co., L.L.C. ("Singh"), Summit Management

Services, Inc. ("Summit"), Creekwood Property Corporation ("Tonti Properties"), Towne Properties Asset Management Company, LTD. ("Towne"), Tribridge Residential, LLC ("Tribridge"), 10 Federal MGMT, LLC d/b/a 10 Federal Companies ("10 Federal'), and Fictitious Defendants John Does 1-100 (collectively "Defendants"), based upon personal knowledge as to their own actions and based upon the investigation of counsel with respect to all other matters, allege as follows:

## INTRODUCTION

1.      The number of Americans living in apartments is increasing.

2.      According to the United States Census, 35% of households live in rented structures and 64% of those rented structures are apartments.[1]

3.      Alongside the increased use of rental structures, rent is up nearly 20% since 2020, with the largest increases concentrated on lower- and middle-tier apartments rented by lower-income consumers.[2]

4.      About half of renters now pay more than 30% of their income in rent and utilities and rising shelter costs were responsible for over two-thirds of January's inflation.[3]

5.      Multifamily Markets, a.k.a. apartment markets, are consequently ripe for unlawful collusion: Property Managers and Landlords are increasingly using software relying on algorithms

---

[1] U.S. Census Bureau, "Selected Housing Characteristics." American Community Survey, ACS 1-Year Estimates Data Profiles, Table DP04", 2022, https://data.census.gov/table/ACSDP1Y2022.DP04?g=010XX00US; Joint Center for Housing Studies of Harvard University, *America's Rental Market 2024*, https://www.jchs.harvard.edu/sites/default/files/reports/files/Harvard_JCHS_Americas_Rental_Housing_2024.pdf
[2] U.S. Bureau of Labor Statistics, Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUUR0000SEHA], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/CUUR0000SEHA, May 3, 2024.
[3] "Rising rents push US inflation higher; rate cuts still expected in 2024," Reuters (February 13, 2024), https://www.reuters.com/markets/us/us-consumer-prices-rise-more-than-expected-january-2024-02-13/

to determine their rental unit prices that threaten to remove renters' ability to vote with their feet and comparison-shop for the best apartment deal around.[4]

6.    Using new technology to collude on rental pricing, however, remains unlawful.

7.    And automating an anticompetitive scheme does not make it less anticompetitive.[5]

8.    In a competitive Multifamily Market, Property Managers and Landlords are blind to competitors' pricing strategies and act unilaterally to price rents at optimal positions to attract renters.

9.    This is usually done by offering a combination of various price-related terms including, among other incentives and elements, the stated monthly rental price, up-front discounts, and length-of-lease discounts.

10.    Defendant Yardi Systems, Inc. ("Yardi"), a California-based real estate software provider, collaborated with its Landlord and Property Manager Clients across the nation by adopting a coordinated pricing strategy using Yardi's "RENTmaximizer" centralized algorithm tool.[6]

11.    Yardi and its RENTmaximizer clients ("Yardi Client Defendants") rely on a cooperative exchange between entities that would otherwise be competitors to supply the "RENTmaximizer" algorithm's collective data set.

---

[4] *See, e.g.,* Salil K. Mehra, *Price Discrimination-Driven Algorithmic Collusion: Platforms for Durable Cartels*, 26 STAN. J. L. & BUS. FIN. 171, 177 (2021).
[5] "Price Fixing Algorithm is Still Price Fixing" Federal Trade Commission Business Guidance Blog, (March 4, 2024) https://www.ftc.gov/business-guidance/blog/2024/03/price-fixing-algorithm-still-price-fixing?utm_campaign=landlords_and_property_ma&utm_content=1709317844&utm_medium=social&utm_source=linkedin.
[6] Upon Information and belief, Defendant Yardi subsequently renamed its RENTmaximizer tool to "Revenue IQ." Accordingly, this Complaint references Defendant Yardi's product and service at issue as "RENTmaximizer" regardless of whether it was named RENTmaximizer or Revenue IQ at the time, unless otherwise noted.

12.     Yardi's clients each give their competitively sensitive unit pricing and supply information to Defendant Yardi, who uses that information to organize market-wide lease pricing that eliminates competition and maximizes profits for the Defendants.

13.     In exchange for and based on that collective data, Yardi's clients are provided automated daily rental prices set at the maximum market tolerance and are able to offer noncompetitive prices to renters without pricing concessions.

14.     In other words, Yardi's clients do not fear being undercut by a competitor's rental pricing because their competitors are using the same pricing thanks to Yardi's "RENTmaximizer."

15.     Defendants' misconduct—centered on the coordination and setting of optimal pricing through a shared, centralized algorithm—is not meaningfully different than a traditional hub-and-spoke price-fixing conspiracy.[7]

16.     This type of agreement to set prices amongst horizontal competitors is *per se* illegal, even when the agreement is through an intermediary, like Yardi.

17.     Defendants conspired to fix rental pricing in the multifamily market, including, but not limited to, fixing advertised list prices, fixing end lease prices, and fixing market conditions to eliminate concessions and specials by using Defendant Yardi's algorithmic software pricing to systematize rents within the multifamily market.

18.     Plaintiffs bring this class action against Defendants for unlawfully conspiring to fix, raise, stabilize, and maintain nationwide multifamily rental prices at artificially high levels and exerting control over the multifamily rental market, for unlawfully agreeing to exchange

---

[7] *See* Federal Trade Commission & U.S. Department of Justice, *Antitrust Guidelines for Collaborations Among Competitors, Pg.* 15–16 (April 2000) (FTC and DOJ's Antitrust Guidelines for Collaborations Among Competitors" emphasize that "[o]ther things being equal, the sharing of information relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive variables. Similarly, other things being equal, the sharing of information on current operating and future business plans is more likely to raise concerns than the sharing of historical information."). *These are precisely the types of information Defendants exchange through Yardi.*

competitively sensitive data in violation of the Sherman Act 15 U.S.C. § 1, et seq., and for damages as a result of Defendants' wrongful conduct in connection with marketing, pricing, leasing, and management of multifamily residential real estate units from September 8, 2019 through the present in the nationwide multifamily housing rental market (hereinafter "the multifamily market.").

19.    This "give to get" conspiracy Plaintiffs challenge is *per se* unlawful, and Plaintiffs bring this action as a class action on behalf of a class of individuals to recover damages, trebled, as well as injunctive and other appropriate relief, detailed infra, on behalf of all others similarly situated.[8]

## PLAINTIFFS

20.    At all relevant times, Plaintiff Madison Shewmaker was and has been a resident and citizen of the State of Georgia, residing within Muscogee County, Georgia.

21.    Plaintiff Shewmaker rents multifamily residential units in properties managed by Landlord Defendant Ram Partners, LLC.

22.    At all relevant times, Plaintiff Jamaar Faison was and has been a resident and citizen of the State of Georgia, residing within Muscogee County, Georgia.

---

[8] This is the fourth known action against Landlords and their pricing coordination: 1. *In re: RealPage Inc. Rental Software Antitrust Litigation* is a multi-district litigation against RealPage, Inc. and a different group of property owners and managers, which is in discovery following a partial denial of a Rule 12(b)(6) motion to dismiss. Yardi is not a party in that litigation. *In re: RealPage Inc. Rental Software Antitrust Litigation* (No. II), md-03071, (M.D. Tenn. 2023). 2. *Duffy v. Yardi Systems Inc. et al*, is against Yardi and a group of property owners and alleging that Defendants' use of algorithmic pricing violates Section 1 of the Sherman Act. The parties have briefed the Defendants' Rule 12(b)(6) motion to dismiss. *Duffy v. Yardi Systems Inc. et al*., cv-01391, (W. Wash. 2023) 3. *Daniel Frank et al v. Yardi Systems, Inc. et al,* is against Yardi and a group of landlords  filed in the Central District of California, differing from *Duffy* in that the action alleges that the unlawful price fixing is the sharing of competitively sensitive data for the purpose of allowing Yardi to use that confidential data to set the rental prices well above those that would exist in a competitive market which the Landlords then impose on their tenants. The parties there have only begun to answer Plaintiffs' Complaint. *Daniel Frank v. Yardi Systems, Inc., et al.*, cv-617 (C.D. Cal. 2024).

23.    Plaintiff Faison rents multifamily residential units in properties managed by Landlord Defendant Ram Partners, LLC.

24.    Plaintiffs Shewmaker and Faison signed their unit leases with Midland Falls Apartment Complex, f/k/a Whisperwood Apartment Complex located at 6363 Flat Rock Rd, Columbus, GA 31907 from March 16, 2022, to March 15, 2023, then from March 16, 2023, to January 2024, then January 2024 to the present.

25.    Plaintiffs Shewmaker and Faison paid inflated rental prices and were otherwise damaged by all Defendants as a result of Defendant Ram Partners, LLC's usage of Yardi's centralized pricing mechanisms, management, and other related, coordinated unlawful actions.

26.    At all relevant times, Plaintiff Cynthia Beevers was and has been a resident and citizen of the State of Colorado, residing within Colorado Springs, Colorado.

27.    Plaintiff Beevers rented multifamily residential units in properties managed by Yardi Client Defendant Ram Partners, LLC.

28.    Plaintiff Beevers signed her unit lease with Trail Ridge at Woodland Park, located at 704 Stone Park Lane, Woodland Park, CO 80863 from approximately June 2021 to March 31, 2023.

29.    Plaintiff Beevers paid inflated rental prices and was otherwise damaged by all Defendants as a result of Defendant Ram Partners, LLC's usage of Yardi's centralized pricing mechanisms, management, and other related, coordinated unlawful actions.

## DEFENDANTS

### A. Defendant Yardi

30.    Defendant Yardi Systems, Inc. ("Yardi") is a privately owned California corporation headquartered in Santa Barbera, California, and doing business in over 40 offices

throughout North America, Europe, Middle East, Asia and Australia, employing over 9,000 people.[9]

31.    In particular, Defendant Yardi has an office within the state of Georgia, located at 500 Colonial Center Pkwy STE 200, Roswell, GA 30076.

32.    Defendant Yardi is a software vendor who licenses and supplies property management applications and services for use within the real estate industry, including the RENTmaximizer/Revenue IQ revenue management software described in this Complaint.

33.    In addition to designing and developing property management software, Yardi licenses, hosts, manages, and supports that software for its real estate and property management clients. [10]

**B.  Yardi Client Defendants**

34.    Defendant A. J. Dwoskin & Associates, Inc. ("A. J. Dwoskin") is a Virginia corporation headquartered in Fairfax, Virginia.

35.    A. J. Dwoskin is a multifamily property manager and owner of more than 1,000 rental units within 11 multifamily communities throughout the state of Virginia.[11]

36.    Beginning in on or about 2012, A. J. Dwoskin and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.

37.    A. J. Dwoskin entered into a written contract, paid for, and used RENTmaximizer (now Revenue IQ) software to artificially raise the rental prices of its multifamily residential property leases.

---

[9] *See* Yardi, "*Yardi Culture*" located at https://careers.yardi.com/yardi-culture/ (last accessed May 8, 2024).
[10] *See* Yardi, *Voyager Residential,* (2023), https://www.yardi.com/products/yardi-voyagerresidential/.
[11] https://www.yardi.com/about-us/success-stories/a-j-dwoskin-associates/?format=pdf (last Accessed Oct. 2, 2024).

38.    A. J. Dwoskin entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing, and supply outputs thereby artificially raising the multifamily unit market rents.

39.    A. J. Dwoskin entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

40.    Defendant Alco Management, Inc. ("Alco") is a Tennessee corporation headquartered in Memphis, Tennessee.

41.    Alco is a multifamily property manager and owner of more than 6,000 rental units throughout 9 states. [12]

42.    Beginning in 2015, Alco and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[13]

43.    Alco entered into a written contract, paid for, and used RENTmaximizer (now Revenue IQ) software to artificially raise the rental prices of its multifamily residential property leases.

---

[12] https://www.alcomgt.com/ (last accessed May 2, 2024).
[13] *Alco management, Inc. Increases Overall NRI by Nearly 4%and Improves Occupancy with Yardi RENTmaximizer,* Business Wire (April 08, 2015); https://www.businesswire.com/news/home/20150408005205/en/Alco-Management-Inc.-Increases-Overall-NRI-by-Nearly-4-and-Improves-Occupancy-with-Yardi-RENTmaximizer.; *The Benefits of BI, Alco Management* (November 8, 2017), https://www.alcomgt.com/blog/2017/11/08/the-benefits-of-bi/.

44.     Alco entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing, and supply outputs thereby artificially raising the multifamily unit market rents.

45.     Alco entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

46.     Defendant Ardmore Residential, Inc. ("Ardmore") is a North Carolina corporation headquartered in Greensboro, North Carolina.

47.     Ardmore is a multifamily property manager and owner of over 6,000 rental units in apartment communities throughout the Southeast United States.[14]

48.     Beginning in 2016, Ardmore and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[15]

49.     Ardmore entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

50.     Ardmore entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get

---

[14] https://www.ardmoreresidential.com/index.aspx (last accessed May 2, 2024); https://www.ardmoreresidential.com/managementteam.aspx (last accessed May 2, 2024).
[15] *Ardmore Residential Raises Rents 5-6% with Yardi RENTmaximizer*, Business Wire (Apr. 21, 2016), https://www.businesswire.com/news/home/20160421005001/en/ArdmoreResidential-Raises-Rents-5-6-with-Yardi-RENTmaximizer.

RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing, and supply outputs thereby artificially raising the multifamily unit market rents.

51.    Ardmore entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

52.    Defendant Balaciano Group f/k/a California Home Builders/DEELS Properties ("Balaciano") is a California stock corporation headquartered in Canoga Park, California.

53.    Balaciano is a multifamily property manager and owner of over 2,000 rental units within 16 apartment communities throughout the state of California.[16]

54.    Balaciano and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.

55.    Balaciano entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamly residential property leases.

56.    Balaciano entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

57.    Balaciano entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also

---

[16] https://balaciano.com/portfolio/ (last accessed May 2, 2024).

share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

58.    Defendant Balke Brown Transwestern, Inc. ("2B Residential') is a Missouri corporation headquartered in St. Louis, Missouri.

59.    Balke Brown Transwestern's trade name for multi-family residential services is 2B Residential.

60.    2B Residential is a multifamily property manager and owner of over 7,700 rental units in over 45 apartment communities throughout the Midwest United States.[17]

61.    Beginning in 2015, 2B Residential and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[18]

62.    2B Residential entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

63.    2B Residential entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

64.    2B Residential entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also

---

[17]    Balke    Brown    Transwestern    Company    Brochure,    *Corporate    Overview    2023    (2023),* https://online.fliphtml5.com/feylm/iooa/#p=2.
[18] *Balke Brown Transwestern Selects Yardi RENTmaximizer for Better Service and Clear Results,* Business Wire (March   03,   2015),   https://www.businesswire.com/news/home/20150303005003/en/Balke-Brown-Transwestern-Selects-Yardi-RENTmaximizer-for-Better-Service-and-Clear-Results.

share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

65.     Defendant Banyan Living Ohio LLC d/b/a Banyan Living ("Banyan") is a New York limited liability company headquartered in Garden City, New York.

66.     Banyan is a multifamily property manager and owner of rental units throughout the United States, primarily in Ohio.[19]

67.     Banyan's Chief Financial Officer is a resident of Georgia, where he works for the company remotely.

68.     Beginning in 2016, Banyan and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[20]

69.     Banyan entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

70.     Banyan entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

71.     Banyan entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs,

---

[19] https://livebanyan.com/about/ (last accessed May 2, 2024).
[20] *Banyan Living Achieves Rent Growth with Yardi RENTmaximizer*, Business Wire (December 13, 2016); https://www.businesswire.com/news/home/20161213005313/en/Banyan-Living-Achieves-Rent-Growth-with-Yardi-RENTmaximizer.

that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

72.     Defendant Oakland Management Corp. d/b/a Beztak Management Company ("Beztak") is a Michigan corporation headquartered in Farmington Hills, Michigan.

73.     Beztak is a multifamily property manager and owner of over 38,000 rental units in apartment communities throughout the United States.[21]

74.     Beginning in 2017, Beztak and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[22]

75.     Beztak entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

76.     Beztak entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

77.     Beztak entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

---

[21] Beztak Properties, *Beztak Corporate Brochure* (2022), https://beztak.com/beztak-corporate-brochure/.
[22] *Beztak Grows Rental Income with Yardi RENTmaximizer*, Business Wire (June 16, 2017), https://www.businesswire.com/news/home/20170616005099/en/Beztak-Grows-Rental-Income-with-Yardi-RENTmaximizer.

78.    Defendant Bridge Property Management, L.C. ("BPM") is a Utah limited liability company headquartered in Salt Lake City, Utah.

79.    BPM is a multifamily property manager and owner of over 60,000 rental units within 169 apartment communities over 20 states throughout the United States, including the State of Georgia.[23]

80.    Beginning in 2015, BPM and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[24]

81.    BPM entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

82.    BPM entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

83.    BPM entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

84.    Defendant Calibrate Property Management, LLC ("Calibrate") is a Washington limited liability company headquartered in Kirkland, Washington.

---

[23] https://www.bridgepm.com/whoweare (last accessed May 2, 2024).
[24] *Bridge Property Management Gains 9.4% Year-Over-Year Rental Growth with Yardi RENTmaximizer,* Business Wire (Sept. 29, 2015), https://www.businesswire.com/news/home/20150929005288/en/Bridge-Property-Management-Gains-9.4-Year-Over-Year-Rental-Growthwith-Yardi-RENTmaximizer.

85.   Calibrate is a multifamily property manager and owner of over approximately 1,900 units in four states and is "rapidly growing."[25]

86.   Calibrate and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.

87.   Calibrate entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

88.   Calibrate entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

89.   Calibrate entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

90.   Defendant Continental Realty Corporation ("CRC") is a Maryland corporation headquartered in Baltimore, Maryland.

91.   CRC is a multifamily property manager and owner of about 10,000 residential units in approximately 34 apartment complexes throughout the states of Florida, Georgia, Illinois, Maryland, North Carolina, Tennessee, and South Carolina.[26]

---

[25] https://calibratemanagement.com/ (last Accessed May 2, 2024).
[26] https://www.crcrealty-apartments.com/searchlisting.aspx (last accessed Oct. 8, 2024).

92.     Beginning in or about 2014, CRC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[27]

93.     CRC entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

94.     CRC entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

95.     CRC entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

96.     Defendant Dalton Management, Inc. ("Dalton") is an Oregon corporation headquartered in Beaverton, Oregon.

97.     Dalton is a multifamily property manager and owner of 15 apartment complexes throughout California, Oregon, and Washington.[28]

---

[27] Yardi Client Success Stories, https://www.yardi.com/about-us/success-stories/continental-realty-corporation-crm/?format=pdf  (last accessed Oct. 2, 2024).
[28] https://daltonmngt.com; (last accessed May 2, 2024).

98.     Beginning in 2016, Dalton and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[29]

99.     Dalton entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

100.     Dalton entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

101.     Dalton entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

102.     Defendant Edward Rose & Sons ("Edward Rose") is a Michigan corporation headquartered in Bloomfield Hills, Michigan.

103.     Edward Rose is a multifamily property manager and owner of over approximately 65,000 rental units in approximately 142 properties throughout approximately 18 states of Alabama, Arkansas, Florida, Illinois, Indiana, Iowa, Kansas, Michigan, Nebraska, North Carolina, Ohio, South Carolina, Tennessee, Virginia, Washington, and Wisconsin.[30]

---

[29] *Dalton Management Reports Increased Revenue Using Yardi RENTmaximizer*, Business Wire (May 19, 2016), https://www.businesswire.com/news/home/20160519005003/en/DaltonManagement-Reports-Increased-Revenue-Using-Yardi-RENTmaximizer.
[30] https://www.edwardrose.com/searchlisting; https://www.yardi.com/blog/news/edward-rose-sons/29827.html (last accessed Oct. 7, 2024).

104.    Beginning at least in or about 2021, Edward Rose and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[31]

105.    Edward Rose entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

106.    Edward Rose entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

107.    Edward Rose entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

108.    Defendant Envolve Communities, LLC d/b/a Envolve LLC ("Envolve") is an Alabama limited liability company headquartered in Montgomery, Alabama.

109.    Envolve is a vertically integrated owner and operator of multi-family housing. [32]

110.    Envolve is a multifamily property manager and owner of over 28,000 residential units in approximately 106 properties throughout 18 states including Alabama, Arkansas, Florida, Georgia, Illinois, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Nebraska, New Mexico, Ohio, Oklahoma, Tennessee, Texas, and Virginia. [33]

---

[31] https://www.yardi.com/blog/news/edward-rose-sons/29827.html (last accessed Oct. 7, 2024).
[32] https://www.envolvecommunities.com/propertymanagement (last accessed Oct. 8, 2024).
[33] https://www.envolvecommunities.com/searchlisting (last accessed Oct. 8, 2024); https://www.yardi.com/about-us/success-stories/envolve-llc/?format=pdf (last accessed Oct. 8, 2024).

111.    Beginning in or about 2012, Envolve and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases. [34]

112.    Envolve entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

113.    Envolve entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

114.    Envolve entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

115.    Defendant FPI Management, Inc. ("FPI") is a California corporation headquartered in Folsom, California.

116.    FPI is a multifamily property manager and owner of over 165,000 rental units throughout 23 states, including the State of Georgia.

117.    FPI and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.

118.    FPI entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

---

[34] *See* https://www.yardi.com/about-us/success-stories/envolve-llc/?format=pdf (last Accessed Oct. 8, 2024).

119.    FPI entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

120.    FPI entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

121.    Defendant Grubb Properties, LLC ("Link Apartments") is a North Carolina limited liability company headquartered in Cary, North Carolina.

122.    Grubb Properties, LLC's trade name is Link Apartments. Link Apartments is a multifamily property manager and owner of 11 properties in District of Columbia, Georgia, North Carolina, South Carolina, Tennessee, and Virginia.[35]

123.    Beginning in 2015, Grubb and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[36]

124.    Link Apartments entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

---

[35] https://www.grubbproperties.com/about-link-apartments (last accessed May 2, 2024).
[36] *Grubb Properties Maximizes Pricing, Achieves Longer Lease Terms with Yardi RENTmaximizer,* Business Wire (December 1, 2015); https://www.businesswire.com/news/home/20161213005313/en/Banyan-Living-Achieves-Rent-Growth-with-Yardi-RENTmaximizer.

125.    Link Apartments entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

126.    Link Apartments entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

127.    Defendant Guardian Real Estate Services, LLC ("Guardian") is an Oregon limited liability company headquartered in Portland, Oregon.

128.    Guardian is a multifamily property manager of at least 124 properties in states including Arizona, Oregon, and Washington. [37]

129.    Beginning in or about 2015, Guardian and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases. [38]

130.    Guardian entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

131.    Guardian entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get

---

[37]https://properties.gres.com/searchlisting.aspx?ftst=&LocationGeoId=0&zoom=10&autoCompleteCorpPropSearchl en=3&renewpg=1&PgNo=3&LatLng=(38.7945952,-106.5348379)&  (last accessed Oct. 7, 2024).
[38] https://www.yardi.com/about-us/success-stories/guardian-on-rightsource/?format=pdf (last accessed Oct. 8, 2024).

RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raise its multifamily unit market rents.

132.     Guardian entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

133.     Defendant HNN Associates, LLC ("HNN") is a Washington limited liability company headquartered in Bellevue, Washington.

134.     HNN is a multifamily property manager of the 52 properties owned by Devco Residential Group, LLC in Washington state.[39]

135.     Beginning in 2015, HNN and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[40]

136.     HNN entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

137.     HNN entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raise its multifamily unit market rents.

---

[39] https://www.lifeisbetterhere.com/ourproperties.aspx (last accessed May 2, 2024).
[40] *HNN Associates, LLC Optimizes Rental Pricing Performance with Yardi RENTmaximizer,* Business Wire (February 17, 2015), https://www.businesswire.com/news/home/20150217005101/en/HNN-Associates-LLCOptimizes-Rental-Pricing-Performance-with-Yardi-RENTmaximizer.

138.    HNN entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

139.    Defendant KRE Group, Inc. d/b/a Kushner Real Estate Group ("KRE") is a New Jersey corporation headquartered in Jersey City, New Jersey.[41]

140.    KRE is a multifamily property manager and owner of approximately 22 rental properties in New Jersey and Pennsylvania. Beginning in 2017, KRE and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[42]

141.    KRE entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

142.    KRE entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

143.    KRE entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all

---

[41] https://thekregroup.com/ (last accessed May 2, 2024).
[42] *KRE Group Grows Profits and Occupancy with Yardi RENTmaximizer,* Business Wire (March 14, 2017), https://www.businesswire.com/news/home/20170314005389/en/KREGroup-Grows-Profits-and-Occupancy-with-Yardi-RENTmaximizer.

participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

144.    Defendant LumaCorp, Inc. d/b/a Luma Residential ("Luma") is a Texas corporation headquartered in Dallas, Texas.[43]

145.    Beginning in 2015, Luma and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[44]

146.    Luma entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

147.    Luma entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

148.    Luma entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

149.    Defendant Manco Abbott, Inc. ("Manco Abbott") is a California corporation headquartered in Fresno, California.

---

[43] https://lumapm.com/# (last accessed May 2, 2024).
[44] *LumaCorp Inc. Reports Revenue, Marketing and Processing Benefits with Yardi Multifamily Solution Products*, Business Wire (February 15, 2015) https://www.businesswire.com/news/home/20150225005192/en/LumaCorp-Inc.-Reports-Revenue-Marketing-and-Processing-Benefits-with-Yardi-Multifamily-Solution-Products.

150.    Manco Abbott is a multifamily property manager of over 30 properties throughout the state of California.[45]

151.    Beginning in 2015, Manco Abbott and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[46]

152.    Manco Abbott entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

153.    Manco Abbott entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

154.    Manco Abbott entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

155.    Defendant McWhinney Property Management, LLC ("McWhinney") is a Colorado limited liability company headquartered in Denver, Colorado.

156.    McWhinney is a multifamily property manager and owner of approximately 19 properties throughout the states of Colorado and California.[47]

---

[45] https://mancoabbott.com/about-us/ (last accessed May 2, 2024).
[46] *Manco Abbott Inc. Achieves Rental Growth, Gains Expert Pricing Insight with Yardi RENTmaximizer*, Business Wire (November 10, 2015), https://www.businesswire.com/news/home/20151110005039/en/Manco-Abbott-Inc.-AchievesRental-Growth-Gains-Expert-Pricing-Insight-with-Yardi-RENTmaximizer.
[47] https://mcwhinney.com/portfolio/?company=multifamily (last accessed May 2, 2024).

157.    Beginning at least in 2021, McWhinney and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.

158.    McWhinney entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

159.    McWhinney entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

160.    McWhinney entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

161.    Defendant Morguard Management Company Inc. ("Morguard") is a Louisiana corporation headquartered in Metairie, Louisiana.

162.    Morguard is a multifamily property manager and owner of approximately 19,000 rental units within more than 50 apartment communities throughout the United States—including the State of Georgia—and Canada.

163.    Beginning in 2015, Morguard and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[48]

---

[48] *See Morguard North American Residential Real Estate Investment Trust, Q4 2015 Earnings Call* (Feb. 18, 2016).

164.    Morguard entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

165.    Morguard entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

166.    Morguard entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

167.    Defendant PRG Real Estate Management, Inc. ("PRG") is a Pennsylvania business corporation headquartered in Philadelphia, Pennsylvania.

168.    PRG is a multifamily property manager and owner of over 10,000 rental units within apartment communities throughout six states.[49]

169.    Beginning in 2016, PRG and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[50]

170.    PRG entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

---

[49] https://www.prgrealestate.com/ (last accessed May 2, 2024).
[50] *PRG Real Estate Increase Rental Income with Yardi RENTmaximizer, Business Wire* (September 15, 2016), https://www.businesswire.com/news/home/20160915005085/en/PRG-Real-Estate-Increases-Rental-Income-with-Yardi-RENTmaximizer.

171.    PRG entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

172.    PRG entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

173.    Defendant R.D. Merrill Real Estate Holdings, LLC d/b/a Pillar Properties ("Pillar Properties") is a Washington limited liability company headquartered in Seattle, Washington.

174.    Under the registered trade name "Pillar Properties," R.D. Merrill is a multifamily property manager and owner of approximately 2,114 units within 10 apartment communities throughout the state of Washington.[51]

175.    Beginning in 2016, Pillar Properties and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[52]

176.    Pillar entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

---

[51] https://www.pillarproperties.com (last accessed May 2, 2024).
[52] Yardi, *Pillar Properties on Elevate,* https://www.yardi.com/about-us/successstories/pillar-properties-on-elevate/; Yardi Systems, Inc., *Empowering Our Clients: Pillar Properties & RENTmaximizer* (Sept. 21, 2016), https://www.facebook.com/Yardi/videos/empowering-ourclients-pillar-properties-rentmaximizer/1219283938135317/ (last accessed May 2, 2024).

177.    Pillar entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

178.    Pillar entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

179.    Defendant RAM Partners, LLC ("RAM') is a Georgia limited liability company headquartered in Atlanta, Georgia.

180.    RAM is a multifamily property manager, investor and property owner of over 70,000 apartment communities throughout across 21 United States, including the State of Georgia.

181.    RAM and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.

182.    RAM entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

183.    RAM entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

184.    RAM entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share

proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

185.    Defendant Singh Management Co., L.L.C. ("Singh") is a Michigan limited liability partnership headquartered in West Bloomfield, Michigan.

186.    Singh is a multifamily property manager and owner of 17 properties throughout Michigan, North Carolina, and Virginia.[53]

187.    Beginning in 2016, Singh and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[54]

188.    Singh entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

189.    Singh entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

190.    Singh entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

---

[53]https://www.singhweb.com/about-us (last accessed May 2, 2024).
[54] *Singh management gains Revenue and Occupancy Growth with Yardi RENTmaximizer*, Business Wire (February 23, 2016), https://www.businesswire.com/news/home/20160223005007/en/Singh-Management-Gains-Revenue-and-Occupancy-Growth-with-Yardi-RENTmaximizer.

191.   Defendant Summit Management Services, Inc. ("Summit") is an Ohio corporation headquartered in Akron, Ohio. Summit is a multifamily property manager and owner of over 4,000 units within 20 apartment communities throughout Colorado, North Carolina, and Ohio.[55]

192.   Beginning in 2012, Summit and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[56]

193.   Summit entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

194.   Summit entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

195.   Summit entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

196.   Defendant Creekwood Property Corporation ("Tonti Properties") is a Texas corporation headquartered in Dallas, Texas.

197.   Creekwood Property Corporation's trade name is Tonti Properties.

---

[55] https://summitmanagementliving.com/ (last Accessed May 2, 2024).
[56] *Yardi RENTmaximizer Gives Summit Management Services Inc. New Rental Pricing Insight*, Business Wire (January 31, 2012), https://www.businesswire.com/news/home/20120131006159/en/Yardi-RENTmaximizer-GivesSummit-Management-Services-Inc.-New-Rental-Pricing-Insight.

198.     Tonti Properties is a multifamily property manager and owner of numerous rental units within 17 apartment communities throughout Arizona, Colorado, Florida, Louisiana, North Carolina and Texas.

199.     Beginning in 2016, Tonti Properties and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[57]

200.     Tonti Properties entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

201.     Tonti entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

202.     Tonti Properties entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

203.     Defendant Towne Properties Asset Management Company, LTD. ("Towne") is an Ohio domestic for-profit corporation headquartered in Cincinnati, Ohio.

---

[57] *Tonti Properties Increases Rental Income with Yardi RENTmaximizer*, Business Wire (June 14, 2016), https://www.businesswire.com/news/home/20160614005001/en/.

204.    Towne is a multifamily property manager and owner of more than 12,000 units within 98 properties throughout Ohio, Kentucky, Indiana, and North Carolina.[58]

205.    Beginning in 2020, Towne and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.

206.    Towne entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

207.    Towne entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

208.    Towne entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

209.    Defendant Tribridge Residential, LLC ("Tribridge") is a Georgia limited liability company headquartered in Atlanta, Georgia.

210.    Tribridge is a multifamily property manager and owner of more 30 properties throughout Georgia, Tennessee, South Carolina, North Carolina, and Florida.

---

[58] https://www.towneproperties.com/ (last accessed May 2, 2024).

211.    Beginning in November 2014, Tribridge and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[59]

212.    Tribridge entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

213.    Tribridge entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

214.    Tribridge entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

215.    Defendant 10 Federal MGMT, LLC d/b/a 10 Federal Companies ("10 Federal') is a North Carolina limited liability company headquartered in Raleigh, North Carolina.

216.    10 Federal is a multifamily property manager and owner of several properties throughout the state of North Carolina.[60]

---

[59] *TriBridge Residential opts for Full Yardi Multifamily Solution Stack,* Yardi Newsletter (Winter 2015), https://media.whatcounts.com/sitestuff_yardi/121914_MFeNews/20141111- tribridge.html.
[60] https://www.10federalmgmt.com/ (last Accessed May 2, 2024).

217.    Beginning in 2015, 10 Federal and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates utilized Yardi's RENTmaximizer as part of the process for determining the price of rental leases.[61]

218.    10 Federal entered into a written contract, paid for, and used RENTmaximizer software to artificially raise the rental prices of its multifamily residential property leases.

219.    10 Federal entered into the contract with Yardi knowing that doing so required it to share confidential, competitively sensitive pricing and leasing information with Yardi to get RENTmaximizer's forward-looking, unit specific supra-competitive rental pricing and supply outputs thereby artificially raising the multifamily unit market rents.

220.    10 Federal entered into its contract with Defendant Yardi knowing that all other entities participating in and utilizing Yardi's software were horizontal competitors that would also share proprietary data necessary for RENTmaximizer to generate its pricing and supply outputs, that all participants would delegate their rental price and supply decisions to Yardi, and that all participants would abide by the pricing and supply outputs generated by Yardi's RENTmaximizer.

221.    Fictitious Defendants John Does 1-100 ("John Does") are those property managers and/or owners who are Yardi's clients and have used its Defendant Yardi's RENTmaximizer revenue management software in setting prices for their multifamily residential property unit leases during the class period.

222.    The true names and capacities, whether individual, corporate, partnership, associate or otherwise of defendants John Does 1 through 100 are unknown to Plaintiffs, who therefore sue these defendants by such fictitious names.

---

[61] *10 Federal Increases Rental Income with Yardi RENTmaximizer, Optimizes Investor Reporting with Yardi Orion Business Intelligence,* Business Wire (July 27, 2015), https://www.businesswire.com/news/home/20150727005133/en/10-Federal-Increases-Rental-Income-with-Yardi-RENTmaximizer-Optimizes-Investor-Reporting-with-Yardi-Orion-Business-Intelligence.

223.    Discovery will reveal the identities of these entities, and Plaintiffs will seek leave to amend this complaint to allege the true names and capacities of Does 1-100 when they are ascertained.

224.    Yardi Client Defendants are some of the largest providers of multifamily housing in the United States who should be competing one another offers a combination of various price-related terms including the stated monthly rental price, unit lease up-front discounts, and length-of-lease discounts, among other incentives and elements to attract renters, make independent pricing, and supply decisions.

225.    Defendants' officers, directors, agents, employees, or representatives engaged in the conduct alleged in this Complaint in the usual management, direction or control of Defendants' business or affairs.

226.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

227.    When Plaintiffs refer to a corporate family or companies by a single name in this Complaint, they are alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family.

228.    The individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.

229.    The individual participants entered into agreements on behalf of their respective corporate families.

230.    As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

## JURISDICTION AND VENUE

231.    This Court has subject matter jurisdiction of these claims under 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

232.    This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as those that give rise to the federal claims.

233.    This Court has personal jurisdiction over the Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22.

234.    This Court has personal jurisdiction over Defendants because they conduct business in Georgia and have sufficient minimum contacts with Georgia.

235.    Defendants also advertise and solicit business in Georgia.

236.    All Defendants either did conduct business within this District or, pursuant to and in furtherance of the anticompetitive acts alleged herein, participated in a conspiracy whereby their actions were intended to and did cause damage in this District.

237.    Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the sale of multifamily residential real estate leases and did have a direct and substantial effect on the interstate commerce of the United States, including in this District.

238.    Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

239.   Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District: Defendants gain significant revenue and profits from doing business in this District, Class Members affected by the practices asserted herein reside in this District, and certain Defendants employ numerous people in this District.

240.   Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District.

241.   Further, each Defendant is a co-conspirator in a price-fixing antitrust conspiracy that was aimed at residents of their properties, including residents in the State of Georgia, which financially injured those residents while deriving substantial revenue for the Defendants.

242.   Yardi Client Defendants BPM, FPI, Link Apartments, Morguard, RAM, and Tribridge supplied confidential information concerning their units in the State of Georgia to RENTmaximizer.

243.   RENTmaximizer used the confidential information supplied by BPM, CRC, Envolve, FPI, Link Apartments, Morguard, RAM, and Tribridge concerning their units in Georgia to calculate rental pricing for the other Yardi Client Defendants throughout the United States.

244.   Conversely, the confidential information supplied by the other Yardi Client Defendants concerning their units located throughout the United States was used by RENTmaximizer to the rental pricing for Defendants BPM, CRC, Envolve, FPI, Link Apartments, Morguard, RAM, and Tribridge's units in the State of Georgia.

245.   By using RENTmaximizer to set unit prices in collusion with other Defendants, each Defendant's prices for their units were influenced by the confidential information supplied by Defendants with properties located in the State of Georgia.

246.   Each Defendant knew that pricing and other confidential information supplied by other property managers utilizing RENTmaximizer across the United States would be used by the software to calculate or determine the rental pricing for their units.

247.   Each Defendant knew the pricing and other confidential information they supplied to RENTmaximizer would be used by the software to calculate or determine the rental pricing for other Defendants' units.

248.   In essence, each Defendant supplied confidential information to RENTmaximizer knowing that the information would be used to calculate rental pricing for the units of other property managers utilizing RENTmaximizer throughout the nation.

249.   Defendants' conduct had the intended and foreseeable effect of causing injury to persons residing in this District.

250.   The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members and many members of the class are citizens of a state different from Defendants.

## FACTUAL ALLEGATIONS

### A.  Relevant Market: National Multifamily Residential Leases

251.   The relevant product market is the market for the lease of multifamily residential rental properties and the relevant geographic market, which is comprised of relevant submarkets, is nationwide.

252.   There are no other close economic substitutes to this product market.

253.   Short-term rentals are not equivalent to permanent purchasing.

254.    For example, the purchase of residential property requires the ability to make a substantial down payment and to obtain financing.

255.    Furthermore, single family residential properties typically do not offer amenities, like gym or pool access, or forms of security, like on-site guards.

256.    For these reasons, residential rental and purchase are two, separate markets and purchasing is not considered to be a close substitute to the multifamily residential rental property market even when consumers are met with anticompetitive and inflated pricing.

257.    Defendant Yardi itself differentiates on their website the multifamily residential real estate market as a separate and distinct market from other residential markets including, inter alia, senior living, affordable housing, social housing, student housing, single-family housing, military housing, and commercial properties.

## B. Historical Pricing and Practices of Multifamily Residential Leases

258.    As part of their participation in the anticompetitive scheme alleged herein, the Yardi Client Defendants share sensitive, competitive information, including pricing, in order to receive the pricing and other competitive information from their would-be competitors; this is a "give to get" scheme.

259.    Defendants effectuate their "give to get" scheme through Yardi's widely used and expansive property management software known as Yardi Voyager Enterprise Resource Planning (or "Yardi Voyager"), which allows multifamily property managers in Georgia, and across the country, to "[c]entralize operational, financial, leasing and maintenance management"[62] into a single, centralized database.[63]

---

[62] Yardi, *Voyager Residential, https://www.yardi.com/products/yardi-voyager-residential/.*
[63] Yardi, *Yardi Multifamily Suite (2019), Pg. 26. https://resources.yardi.com/documents/multifamily-suite-brochure/*

260.    Defendant Yardi dominates the property management software industry because of "widespread adoption of its Voyager software" and the massive costs associated with transferring data and information Yardi Voyager users would incur if they chose to switch software.[64]

261.    As of October 2023, Yardi represented "over 15 million units on its platform,"[65] but those numbers are likely far higher today.

262.    There are approximately thirty different applications, or software modules, property managers can purchase that are fully integrated with Yardi Voyager.

263.    One such module is the "revenue management system" called RENTmaximizer.

264.    In 2011, Defendant Yardi launched a new "revenue management system" integrated into the Yardi Voyager platform called "RENTmaximizer,"[66] which was described as a dynamic, automated revenue management system built into Yardi products and designed to optimize revenue[67] by automating rental pricing methods for both new and renewal leases.[68]

265.    In Defendant Yardi's own words, the RENTmaximizer algorithm promises to "[i]ncrease insight with analytics for all components that drive revenue. Machine learning based on a proprietary feedback loop continuously advances algorithms and makes the system smarter"[69] and leverages a built-in proprietary feedback loop to continuously advance algorithms, making the system smarter.[70]

---

[64] Multiple lawsuits filed by rivals for monopolization in the market evidence Yardi's dominance. *See e.g.* RealPage Inc's Second Amended Counterclaim, at ¶ 26, *Yardi Systems, Inc. v. RealPage, Inc.,* No. CV11-690 ODW (C.D. Cal. 2011); Plaintiff's First Amended Complaint, ¶ 24, *Entrata v. Yardi Systems*, 2:15-cv-00102-CW (D. Utah, 2015).
[65] Yardi, *Yardi Announces the Elimination of ACH Rent Payment Fees* (Oct. 31, 2023), https://www.yardi.com/news/press-releases/yardi-announces-the-elimination-of-ach-rentpayment-fees/.
[66] *See Yardi Adds Two Revenue Management Experts to its Yardi RENTmaximizer Team*, Business Wire (June 22, 2011),     https://www.businesswire.com/news/home/20110622006700/en/Yardi-Adds-Two-Revenue-Management-Experts-to-its-YardiRENTmaximizer-Team.
[67] Yardi, *Yardi Multifamily Suite* (2019), Pg. 26. https://resources.yardi.com/documents/multifamily-suite-brochure/
[68] Yardi, *Yardi Revenue IQ* (2021), https://resources.yardi.com/documents/revenue-iq-brochure/.; *See Yardi Adds Two Revenue Management Experts to its Yardi RENTmaximizer Team*, Supra Note 62.
[69] *Id.*
[70] Yardi, *Yardi Multifamily Suite* (2019), Supra Note 63.

266.    Yardi's RENTmaximizer markets to prospective clients including owners of residential properties, companies that serve as both owners and operators of residential properties, and property management companies, including large residential rental apartments across the United States.

267.    Significantly, Defendant Yardi's RENTmaximizer markets to prospective clients who are horizontal market competitors who must compete with one another to attract renters usually by offering concessions, specials, or otherwise lowering rents.

### C. All Defendants Conspired to Eliminate Competition by Outsourcing Independent Pricing and Supply Decisions to RENTmaximizer

268.    In a competitive multifamily residential rental market, property owners and managers are blind to competitors' pricing strategies, and property management companies must independently make pricing and supply decisions based on their own assessment of how best to compete with other properties.[71]

269.    Traditionally, property owners and managers acted and priced units independently by following the policy of physical occupancy.

270.    Property owners effect strategies to optimize income that are engendered to market fluctuations and competitive pressures.[72]

271.    Maintaining occupancy rates instead of rental prices makes economic sense because, in a competitive market, every day a unit is left empty is a property owner's financial loss.

---

[71] *See* Patricia Todoran, *Mission Success: Driven by Data, Multi-Housing News* (Sept. 6, 2018), https://www.multihousingnews.com/mission-success-driven-by-data/ (noting how data driven analytics allow property management companies to keep concessions "very minimal" while keeping rental rates "on the rise.")

[72] Yardi Matrix, Bulletin, *The Rise and Fall of Concessions: Is the Market Resetting?* (Jan. 2021), https://www.YardiMatrix.com/Publications/Download/File/1190-MatrixMultifamilyConcessionsBulletin-January2021.

272.     This maximization of "heads in the beds" strategy also minimized turnover expenses, as there were hard costs associated with finding and evaluating a replacement tenant as well as lost revenue opportunities if the unit sat vacant between tenants.

273.     One example of this functioning was during Covid-19 when demand fell and apartment owners employed strategies including "rolling over leases with no bump in rent and increasing use of concessions, mainly by offering periods of free rent" to maintain occupancy rates.[73]

274.     Uncertainty from lack of knowledge regarding competitors' operational details, like rental unit rates and vacancies within a multifamily rental property, fundamentally results in market competition between property owners and managers for prospective tenants.

275.     In a competitive multifamily residential rental market, each property manager sets its own rental terms and competes for renters based on price.

276.     To compete, property managers may offer prospective renters incentives, concessions, and elements, such as a combination of various price-related terms including the stated monthly rental price, up-front discounts, and length-of-lease discounts.

277.     Without the ability to coordinate their pricing with competitors, property managers could not raise their rents above the rates of their competitors because that would result in losing prospective tenants to competitors.

278.     In other words, a philosophy of economic occupancy, i.e., increasing rental prices while accepting the resulting reduction in physical occupancy, results in competitors undercutting rental prices, or making other concessions, to prospective renters to increase their market share at the expense of their competitors.

---

[73] *Id.*

279.    By beating out their competitors' rental prices (or by offering other price-related concessions), a property owner or manager can increase their occupancy rate, and, thus, their profits and market share.

280.    With collusion, however, this price competition is avoided.

281.    Accordingly, Yardi and the Yardi Client Defendants entered into a collusive pricing strategy where the Yardi Client Defendants collectively agreed to provide Yardi with sensitive competitive pricing and supply data, including rental unit rates, lease terms, and occupancy data, with the understanding that the data would be leveraged by Yardi's RENTmaximizer to generate forward looking, unit-specific, supra-competitive rental pricing.

282.    In fact, the Yardi Client Defendants' contracts with Yardi define "Client Data" to include all data that is entered into the Yardi Voyager database.

283.    The Yardi Client Defendants' client data is expressly identified in the contracts as "Confidential Information."

284.    Further, Yardi Client Defendants contractually agree to allow Yardi's employees to access and extract their client data that is maintained on the Voyager database daily for data trend analysis by Yardi's RENTmaximizer pricing engine.  In return, Yardi Client Defendants receive daily pricing from RENTmaximizer.

285.    By participating in Yardi's "give to get" scheme, the Yardi Client Defendants know that RENTmaximizer uses their individual, sensitive competitive data to generate its supra-competitive pricing and supply outputs and that the algorithm's outputs will be routinely adopted by themselves and their competitors.

286.    Defendants effectuate their scheme through Yardi Voyager's "revenue management system" tool, RENTmaximizer.

287.    RENTmaximizer effectively transfers the management of rental pricing from a landlord to Defendant Yardi.

288.    RENTmaximizer was Yardi's attempt to make "automated rental pricing a key element of the [Yardi] platform."[74] and help "multifamily property managers maximize rental income" by "increasing a multifamily property owner's revenue by 3 to 6 percent."[75]

289.    Specifically, RENTmaximizer:

> helps apartment owners and managers set prices directly from the trends of supply, demand and market conditions (i.e., market comparisons). Using pricing algorithms, this holistic trends-and-rules-based model helps multifamily property managers maximize rental income and occupancy by pricing each new and renewal lease for maximum revenue. Yardi RENTmaximizer also provides complete transparency into how the price was determined to further facilitate the leasing process.[76]

290.    Yardi offers to "manage pricing" and "automate the rental pricing process" for its clients using Yardi's RENTmaximizer, allowing clients to "eliminate rent rate guesswork and traditional sales devices such as concessions and specials."[77]

291.    Since its inception, the purpose of RENTmaximizer was to, in effect, delegate the multifamily residential unit rental pricing decision making process from property managers,

---

[74] *Yardi Adds Two Revenue Management Experts to its Yardi RENTmaximizer Team*, Business Wire (June 22, 2011), https://www.businesswire.com/news/home/20110622006700/en/Yardi-Adds-Two-Revenue-Management-Experts-to-its-YardiRENTmaximizer-Team.
[75] *See Yardi Adds Two Revenue Management Experts to its Yardi RENTmaximizer Team, Supra Note 64.*
[76] *Id.*
[77] *See HNN Associates, LLC Optimizes Rental Pricing Performance with Yardi RENTmaximizer,* Business Wire (Feb. 17, 2015), https://www.businesswire.com/news/home/20150217005101/en/HNN-Associates-LLC-Optimizes-Rental-Pricing-Performance-with-Yardi-RENTmaximizer. ("RENTmaximizer has taken the guesswork out of our rental pricing and lease terms, and boosts pricing performance through an intelligent system of measurements, fixed factors, and discipline."); *Supra Note 27;* ("Yardi RENTmaximizer helps clients drive revenue with clear, comprehensive metrics focusing on operational components including rental income, concessions, occupancy and rental rates — not just pricing."); *BSR Trust LLC Increases Rental Income with Yardi RENTmaximizer,* Business Wire (July 19, 2023), https://www.businesswire.com/news/home/20120719006370/en/BSR-Trust-LLCIncreases-Rental-Income-with-Yardi-RENTmaximizer.("RENTmaximizer "improved business performance" by, among other things, "eliminating concessions").

including the Yardi Client Defendants, to Yardi, once competitively sensitive information had been shared, compiled, and evaluated for pricing increase opportunities.

292.    That is, RENTmaximizer was intended to eliminate the traditional methods of competition, such as rent concessions and other specials property managers offered to prospective tenants in a competitive market, by fully automating pricing and supply decisions to the RENTmaximizer algorithm.

293.    Indeed, according to Yardi, this was one of the "key benefits"[78] of RENTmaximizer: "[b]y automating rental pricing that factors in portfolio and market data, RENTmaximizer not only improves rental income while maintaining occupancy, but it also simplifies the process by eliminating rent rate guesswork and traditional sales devices such as concessions and specials."[79]

294.    To achieve these promises, Yardi's clients must allow Yardi to use their competitively sensitive pricing and supply data in its RENTmaximizer algorithms, both to set each client's own rent prices (and consequently, to set rent prices of each Yardi Client Defendants' horizontal competitors).[80]

295.    RENTmaximizer specifically asks Yardi Client Defendants to record their sensitive and competitive data, such as rental rates, unit types and current occupancy status, for RENTmaximizer's dataset.

---

[78] S*upra note* 60, (explaining that one "Key Benefit" of RENTmaximizer is that the algorithm "[a]utomates consistent decisions and improves compliance[.]").

[79] *See The Rockbridge Group Increases Rent Revenue with Yardi RENTmaximizer,* Business Wire (June 21, 2016) https://www.businesswire.com/news/home/20160621005024/en/Rockbridge-Group-IncreasesRent-Revenue-Yardi-RENTmaximizer.

[80]*See BSR Trust LLC Increases Rental Income with Yardi RENTmaximizer,* Business Wire (July19, 2023), https://www.businesswire.com/news/home/20120719006370/en/BSR-Trust-LLCIncreases-Rental-Income-with-Yardi- RENTmaximizer ("all [property managers] have to do is enter some market study data…and RENTmaximizer does the rest.").

296.    Meanwhile, the system automatically incorporates market-specific information on "comparative rent" and metrics on "markets, submarkets, competition, developments, rents, occupancy and more" to give users "complete visibility" to the market, submarket, and competition."[81]

297.    RENTmaximizer's rental pricing algorithm calculates a "rent recommendation" by leveraging data gathered from RENTmaximizer users, as well as comparative rent, that users are compelled to automatically adopt.[82]

298.    Per Yardi, the algorithm "empowers leasing staff to close more high-value leases and raise in-place rents" and beat the market to gain maximum rental income/revenue, while improving occupancy and reducing turnover costs.[83]

299.    Yardi's pricing strategy, using the RENTmaximizer algorithm tool to set the Yardi Client Defendants' rental prices for multifamily rental units they facilitate, increases prices regardless of market conditions and allows the Yardi Client Defendants to de-prioritize competitive market measures like maintaining traditional occupancy rates.[84]

300.    By using Yardi's RENTmaximizer tool, each Yardi Client Defendant purposefully chooses to share their competitive data because the Yardi Client Defendants understand that sharing their confidential pricing and occupancy data with Defendant Yardi is mutually beneficial.

---

[81]  Yardi, *Yardi Elevate Multifamily Suite* (2019), https://resources.yardi.com/documents/elevate-suite-for-multifamily-brochure-/;Yardi, *Yardi Elevate* (2020), https://resources.yardi.com/documents/elevate-suite-for-multifamily-brochure/.
[82]  *See* Towne Properties Yardi Manual, supra note 55.
[83]  Supra note 78; Yardi, *Revenue Grows on Yardi: RENTmaximizer* (video), (June 19, 2017), https://www.facebook.com/Yardi/videos/revenue-grows-on-yardi-rentmaximizer/1501017369961971/ (last accessed May 7, 2024).
[84]  *See* Leah Etling, *Revolutionary Revenue: Market Data Insight* (Aug. 27, 2014), The Balance Sheet: Yardi Corporate Blog,
https://web.archive.org/web/20140908043659/https://www.yardi.com/blog/news/revolutionaryrevenue/11339.html
("...apartments are typically run with extremely high occupancy rates. It may require a change in mentality, but there are some real opportunities to realize rent gains with the use of a revenue management solution,").

301.    In each agreement with Yardi, each of the Yardi Client Defendants agree to provide Yardi with their competitively sensitive pricing and occupancy data, incorporating the granular details of the most competitively sensitive and proprietary information about the each of their multifamily property and rental units, such as "rental income, concessions, occupancy and rental rates."[85]

302.    Yardi's agreements with the Yardi Client Defendants supplant the competition that would have reduced prices for renters with price raising collusion.

303.    Yardi Client Defendants provide Yardi with this critical information that is necessary to successfully maximize the rent of each multifamily rental, thus emboldening Defendants to "push rents without sacrificing occupancy, [and] eliminate the fear factor of exposure."[86]

### D. Yardi Enters Comprehensive Data from A Yardi Client Defendant In "Yardi Matrix" Dataset --- Yardi Matrix Then Feeds Collective Yardi Client Data into RENTmaximizer

304.    Yardi Client Defendants' data is recorded in Yardi Matrix, a subscriber-access commercial real estate intelligence source also operated by Yardi that "offers the industry's most comprehensive market intelligence;" Yardi Matrix collects data from Defendants and other multifamily operators related to rental prices at multifamily properties across the entire nation[87] and provides users with various types of data about properties in certain markets, including rent and occupancy data.[88]

305.    Defendant Yardi explains that Yardi Matrix:

> Provides critical data to the professional property manager. Our comprehensive property-level data makes it easy to benchmark property

---

[85] Yardi, *Yardi Revenue IQ* (2021), https://resources.yardi.com/documents/revenue-iq-brochure/.
[86] *See* Supra Note 22; 74.
[87] *Yardi Matrix Multifamily*, supra note 63.
[88] Yardi, *Yardi Matrix*, https://www.yardimatrix.com/.

performance, canvas competitors and neighborhoods and find new contracts. Gain a valuable understanding of the nature and performance of any portfolio of properties, using our powerful set of research and comparative market analysis tools.[89]

306.    Yardi's database is centrally valuable and the cornerstone of its client business[90] because the engine driving Yardi's business is comparative analysis to the market, submarket, and competition using competitor pricing data.[91]

307.    Yardi further represents that its database is the "largest and deepest refined database in the industry,"[92] leveraging "the most comprehensive apartment (>50 units) market data source covering 19+ million units, encompassing 90% of the U.S. Population."[93]

308.    Yardi Matrix's "apartment information service" is particularly described as "a high-performance system *with the sole function of supporting the commercial apartment industry's dominant participants.*"[94]

309.    The Yardi Client Defendant's collective competitively sensitive unit pricing and supply data is maintained in Yardi's Matrix database that is so comprehensive that Yardi can generate a near real-time Unit Pricing Report ("UPR") recommending unit pricing in a Multi-Family Market for any unit type at any time based on competitor pricing.[95]

---

[89] Yardi, *Yardi Matrix: Real Estate Data & Comparative Analysis Tools*, https://www.yardimatrix.com/Property-Types/Solutions/Management-Portfolio-Health.
[90] *Yardi Elevate Multifamily Suite*, supra note 78; Yardi, *Multifamily Market Data and Analysis,* https://www.YardiMatrix.com/PropertyTypes/Multifamily.
[91] *Id.*
[92] Yardi, *How We Compare*, https://www.Yardi Matrix.com/About-Us/How-We-Compare.
[93] *Yardi Matric Multifamily*, Supra Note 63.
[94] Yardi, *Yardi Matrix Rent Survey*, https://yardirentsurvey.wordpress.com/.(emphasis added).
[95] *See Towne Properties Yardi Manual,* Supra Note 55; *See also* Yardi Systems, Inc., *Yardi Elevate* (2020), https://resources.yardi.com/ documents/elevate-suite-for-multifamily-brochure/; *Beztak Grows Rental Income with Yardi RENTmaximizer,* Business Wire (June 16, 2017), https://www.businesswire.com/news/home/20170616005099/en/Beztak-Grows-Rental-Income-with-Yardi-RENTmaximizer.

310.    In fact, the Yardi Matrix Database is so detailed, and the resulting Yardi Database pricing recommendation so sensitive to movements in a particular Multi-family Housing Market, that the UPR "is only valid for the current day (until midnight) not twenty-four (24) hours."[96]

311.    Yardi Matrix significantly contributes extensive, granular market pricing data collected by Yardi Matrix's "apartment information services" from multiple "rent surveys" conducted annually.[97]

312.    Rent Surveys collect critical multifamily market pricing data at two levels: the individual property or overview of market conditions critical to the assessment of current, and prospective, market status" including property unit breakdowns, sales and loan history, occupancy history, rental rate history for tens of thousands of properties.[98]

313.    Upon information and belief, as part of the rent survey, Yardi employees, masquerading as potential renters, call competitor apartment communities to collect information about rents and current rent specials.[99]

---

[96] *See Towne Properties Yardi Manual,* Supra Note 55.

[97] *Id.;* Yardi Matrix, *Matrix- Fact Sheet,* https://www.Yardi Matrix.com/About-Us/Press-Kit/Factsheet, ("We are active in 177 Multifamily markets across the U.S., providing researched data on properties at least 50 units in size including exclusive data on single-family rentals in build-to-rent communities."); *see also "Yardi Matric: Real Estate Analysis Made Quick and Simple,"* PropTechOutlook https://www.proptechoutlook.com/

[98] Yardi, *Yardi Matrix Rent Survey,* https://yardirentsurvey.wordpress.com/.;Yardi, *Multifamily Market Data and Analysis,* https://www.Yardi Matrix.com/PropertyTypes/Multifamily.; Yardi, *How We Compare,* https://www.Yardi Matrix.com/About-Us/How-We-Compare.

[99] Yardi Matrix, *how we Report Rental Market Conditions,* https://www.Yardi Matrix.com/About-Us/Our-Methods/How-We-Report-Rental-Market-Conditions; Yardi Matrix, *how we Survey Rental Market Conditions* https://www.Yardi Matrix.com/About-Us/Our-Methods/How-We-Report-Rental-Market-Conditions/How-We-Survey-Rental-Concessions *See "Yardi Matric: Real Estate Analysis Made Quick and Simple,"* PropTechOutlook, https://www.proptechoutlook.com/yardi-matrix. ("all the information in Yardi Matrix's database is continuously updated, curated, and cleansed to reflect the latest conditions of the properties. In case any data needs further verification, the experts at Yardi Matrix manually collect the additional information regarding the properties and update it in their database."); *See* Yardi Matrix "Press Kit- FAQs", https://www.Yardi Matrix.com/About-Us/Press-Kit/FAQs.

314.     Yardi uses Yardi Matrix's combined information for RENTmaximizer analysis, stating that asking rent adjustments in RENTmaximizer are based, in part, on "public information collected through surveys."[100]

315.     Yardi Client Defendants also provide information to Yardi Matrix with the understanding that, in part, they will receive pricing recommendations from RENTmaximizer that are based on this extensive Yardi Matrix data.

316.     Yardi Client Defendants contractually agree to share pricing and occupancy data with Yardi and understand that aggregated data from Yardi Matrix is used as part of RENTmaximizer.[101]

### E.  Yardi's Revenue Managers Preserve Conspiracy by Managing Client Pricing

317.      Defendant Towne's Yardi user manual reveals how simple and limited inputs are for RENTmaximizer pricing determinations in order to automatically set prices for a unit: a property manager merely inputs a specific move-in time frame and lease term into the RENTmaximizer system, then RENTmaximizer will populate the "best price" for that selected unit.[102]

318.     Yardi prices each of the Yardi Client Defendants' leases using the broad array of competitively sensitive pricing data provided by the would-be competitors—data that is not available to any individual Landlord: "Leases are priced by the system daily, which allows for fast adjustment to market conditions and changes in your inventory and traffic, while adjusting for cost

---

[100] Yardi, *Yardi Matrix* (2021), *Yardi RENTmaximizer Comparable; Yardi RENTmaximizer Property Ratings: Improvement and Location Rating System.*
[101] Yardi, Revenue IQ, https://www.yardielevate.com/multifamily/revenue-iq/.
[102] *See* Supra Note 55.

constraints such as vacancy loss, turnover costs, inventory hold days and lease expiration management."[103]

319.    Indeed, Yardi boasts that it will adjust pricing daily "based on market conditions and your inventory" and provide "daily management reports to understand pricing changes based on availability, demand and competition."[104]

320.    Yardi also touts that each RENTmaximizer client "enjoy[s] greater confidence that you are delivering the best possible rental prices,"[105] which, according to the Yardi Client Defendants, is the rental prices set at the maximum, without pricing concessions, that a certain market can tolerate, not the most competitive price.

321.    Yardi notes that its pricing algorithm generates rents that "maximize rental income" for users, including Yardi Client Defendants,[106] and that its process is "transparent" to property managers so that "they can understand what factors are influencing pricing."[107]

322.    Other Yardi promotional materials also emphasize the extent to which Yardi gives its clients access and insight into competitor data.[108]

---

[103] Yardi, *Yardi Revenue IQ* (2021), https://resources.yardi.com/documents/revenue-iq-brochure/.

[104] *Id.;* Yardi, *Yardi Revenue IQ* (2021), https://resources.yardi.com/documents/revenue-iq-brochure/.; DEELS Properties Gets Results with Yardi RENTmaximizer, Business Wire (Feb. 26, 2018), https://www.businesswire.com/news/home/20180226005236/en/DEELS-PropertiesGets-Results-with-Yardi-RENTmaximizer; Yardi, Yardi RENTmaximizer Market Analysis: 2013 Performance Results, The Balance Sheet: Yardi Corporate Blog (Mar. 1, 2015), https://web.archive.org/web/20210302115856/https://www.yardi.com/blog/uncategorized/yardirentmaximizer-market-analysis/12670.html; *See Yardi Adds Two Revenue Management Experts to its Yardi RENTmaximizer Team*, Business Wire (June 22, 2011), https://www.businesswire.com/news/home/20110622006700/en/Yardi-Adds-Two-Revenue-Management-Experts-to-its-YardiRENTmaximizer-Team.

[105] Yardi, *Yardi Elevate Multifamily Suite* (2019), https://resources.yardi.com/documents/elevate-suite-for-multifamily-brochure/; Yardi, *Yardi Revenue IQ* (2021), https://resources.yardi.com/documents/revenue-iq-brochure/.

[106] *DEELS Properties Gets Results with Yardi RENTmaximizer*, Business Wire (Feb. 26, 2018), https://www.businesswire.com/news/home/20180226005236/en/DEELS-PropertiesGets-Results-with-Yardi-RENTmaximizer.

[107] *Id*.

[108] *See Beztak Grows Rental Income with Yardi RENTmaximizer,* Business Wire (June 16, 2017), https://www.businesswire.com/news/home/20170616005099/en/Beztak-Grows-Rental-Income-with-Yardi-RENTmaximizer

323.    But transparency in understanding how pricing is determined and confidence in a price Yardi generates for a Yardi Client Defendant does not equal absolute control over property pricing.

324.    Control over Yardi Client Defendants' property pricing remains with Yardi.[109]

325.    Upon information and belief, Yardi builds strict lock downs and permission structures into RENTmaximizer which virtually eliminate client overrides of the rental prices and lease lengths generated by Yardi's RENTmaximizer to ensure conformity and compliance with Yardi's pricing strategy.

326.    And, while those barriers to overriding can vary at the margins for individuals and their property managers, RENTmaximizer's lock downs and permission structures are functionally the same for every Yardi Client Defendant.

327.    Yardi Client Defendants know and understand that they each are bound by substantively and operationally the same lock downs and permission structures that thwart competitor overrides, the effect of which is the uniform adoption of RENTmaximizer's "best" prices.

328.    Multiple statements and supporting documents made by both Yardi and the Yardi Client Defendants indicate "property pricing is controlled by" RENTmaximizer unless overridden by Yardi Defendant Client action.[110]

---

[109] *See* Supra Note 55.
[110] *See BSR Trust LLC Increases Rental Income with Yardi RENTmaximizer,* Business Wire (July 19, 2023), https://www.businesswire.com/news/home/20120719006370/en/BSR-Trust-LLCIncreases-Rental-Income-with-Yardi-RENTmaximizer. ("all [property managers] have to do is enter some market study data every month, and RENTmaximizer does the rest."); *The Rockbridge Group Increases Rent Revenue with Yardi RENTmaximizer,* Business Wire (June 21, 2016) https://www.businesswire.com/news/home/20160621005024/en/Rockbridge-Group-IncreasesRent-Revenue-Yardi-RENTmaximizer ("Rockbridge's adoption of RENTmaximizer allowed it to "take the guesswork out of pricing" and "eliminate[] all concessions and specials."); *Yardi RENTmaximizer Gives Summit Management Services Inc. New Rental Pricing Insight,* Business Wire (Jan. 31, 2012), https://www.businesswire.com/news/home/20120131006159/en/Yardi-RENTmaximizer-Gives-Summit-

329.    For example, President Brantly White of Ardmore Residential, a multifamily housing operator located in North Carolina and RENTmaximizer client, stated in a 2016 Yardi press release that Ardmore was able to raise rents 5-6% since its implementation of Yardi RENTmaximizer in 2016.

330.    White explained that "RENTmaximizer has allowed us to push rents more aggressively and takes more human error out of the process,"[111] and openly acknowledged that "[w]e simply wouldn't have raised rents that much or that quickly on our own."[112]

331.    Upon information and belief, to additionally ensure the Yardi Client Defendants adopt the RENTmaximizer prices controlled by Yardi, Yardi Client Defendants are assigned a "Revenue Manager" by Yardi.

332.    Revenue Managers are Yardi employees who meet with and monitor their assigned Yardi client for conformance with pricing recommendations.[113]

---

Management-Services-Inc.-NewRental-Pricing-Insight. ("RENTmaximizer's automated pricing matrix has allowed us to eliminate concessions."); *McCaffery Interests Leverages Yardi's Single-Platform Approach for Efficient Property Management,* FM Link (Feb. 5, 2015), https://www.fmlink.com/articles/mccaffery-interestsleverages-yardis-single-platform-approach-for-efficient-property-management/. ("… boosted by Yardi RENTmaximizer, which automates the process of calculating best rents."); *HNN Associates, LLC Optimizes Rental Pricing Performance with Yardi RENTmaximizer, Business Wire* (Feb. 17, 2015), https://www.businesswire.com/news/home/20150217005101/en/HNN-Associates-LLC-Optimizes-Rental-Pricing-Performance-with-Yardi-RENTmaximizer ("RENTmaximizer has taken the guesswork out of our rental pricing and lease terms, and boosts pricing performance through an intelligent system of measurements, fixed factors and discipline.").

[111] *Ardmore Residential Raises Rents 5-6% with Yardi RENTmaximizer*, Business Wire (Apr. 21, 2016), https://www.businesswire.com/news/home/20160421005001/en/ArdmoreResidential-Raises-Rents-5-6-with-Yardi-RENTmaximizer.

[112] *Id.*

[113] *See* Yardi, *Yardi Multifamily Suite* (2019), https://resources.yardi.com/documents/elevate-suite-for-multifamily-brochure/; *Noam Hameiri, Pricing That Wins – Interview,* LinkedIn (June 29, 2018), https://www.linkedin.com/pulse/pricing-wins-interview-noam-hameiri-mba/ ("the extensive reporting and the weekly phone call with our dedicated RENTmaximizer expert are some of the best parts of the system."); *Manco Abbott Inc. Achieves Rental Growth, Gains Expert Pricing Insight with Yardi RENTmaximizer,* Business Wire (November 10, 2015), https://www.businesswire.com/news/home/20151110005039/en/Manco-Abbott-Inc.-AchievesRental-Growth-Gains-Expert-Pricing-Insight-with-Yardi-RENTmaximizer ("[h]aving a dedicated revenue manager working with us from the Yardi RENTmaximizer team is a huge benefit. If our staff or property owners' question any of our rates, we have our Yardi RENTmaximizer expert who can dig deeper to support our pricing — and that gives our organization and clients great confidence."); *see* Yardi, *The RENTmaximizer Pricing System: Establishing an Automated Pricing System* (Mar. 1, 2015), https://web.archive.org/web/20210302112741/https://www.yardi.com/blog/uncategorized/therentmaximizer-pricing-system/12666.html.

333.    The "experienced revenue manager" Yardi provides to the Yardi Client Defendants "help manage pricing" on Yardi Client Defendants' units and assist Yardi Client Defendants in "control[ling] pricing at the property level." [114]

334.    Upon information and belief, Yardi also uses Revenue Managers to enforce compliance with the algorithm.

335.    Revenue Managers are directed to monitor all pricing "exceptions" requested by Yardi Client Defendants and use "exceptions reports" to hold Yardi Client Defendants to RENTmaximizer's pricing and supply outputs.

336.    As such, especially for new leases, Yardi Client Defendants almost never override RENTmaximizer's forward looking, unit specific supra-competitive pricing and supply outputs.

337.    Despite Yardi insisting their generated pricing for the Yardi Client Defendants are recommendations, Defendant Yardi's aggressive campaign to ensure Yardi Client Defendants conform to Yardi's recommendations without exception disprove the notion.

338.    Yardi designed the RENTmaximizer so that Yardi Client Defendants never need to communicate directly with one another to coordinate their pricing.

339.    Although the Yardi Client Defendants do not directly share their pricing strategies with one-another, they all know that they share confidential rental information with Yardi and that their competitively sensitive data is then used by Yardi's RENTmaximizer to generate forward-looking, unit specific supra-competitive pricing and supply outputs to increase industry wide profits on the backs of renters.

---

[114] *Id.*; Yardi, *Yardi Revenue IQ* (2021), https://resources.yardi.com/documents/revenue-iq-brochure.; Yardi, *Yardi Elevate* (2020), https://resources.yardi.com/documents/elevate-suite-for-multifamily-brochure/ ("[revenue managers] works closely with individual lessors to hone their usage of RENTmaximizer by "get[ting] to know your business processes, assets, and goals to provide superior support and . . . work[ing] with you to maximize your returns.").

340.    Yardi Client Defendants need only accept the algorithmically generated, forward-looking, unit specific, supra-competitive rental price and supply outputs knowing that all other Yardi Client Defendants will do the same because of Yardi's system wide lock downs, overriding restrictions and permission structures, and the oversight of Yardi's Revenue Managers.

341.    The Yardi Client Defendants enter into agreements with Yardi for the use of RENTmaximizer not only aware of the sharing of sensitive information and of Yardi's pricing mechanisms, but *because* of these promises from Yardi.

342.    The purpose of utilizing Yardi's RENTmaximizer is to raise prices above what a functioning competitive market would support.

343.    Thus, Yardi Client Defendants each agreed to use RENTmaximizer for their rental pricing and supply decisions with the understanding that they all agreed to do the same.

344.    In furtherance of and demonstration of their knowing participation, RENTmaximizer tracks every requested override and generates an "exceptions report."

345.    If the "exceptions report" for a particular Yardi Client Defendant shows repeated overrides, the dedicated Revenue Manager assigned by Yardi will use the report in their weekly call to explain the resulting loss of economic occupancy.

346.    In other words, the Yardi Revenue Managers use the "exceptions reports" as surveillance to hold Yardi Client Defendants accountable to the pricing and supply outputs generated by Yardi's RENTmaximizer.

347.    In this way, the Revenue Managers work in tandem with the override controls imbedded into RENTmaximizer.

348.    Not only do Yardi Client Defendants pay premium prices to use RENTmaximizer's algorithmic pricing output to "beat the market," but Yardi's system and the Revenue Managers

assigned by Yardi also actively monitors lessor overrides with the ultimate result of ensuring pricing compliance.

349.    Yardi also offers continuous training to RENTmaximizer clients for use and operation of the Yardi product suite and specifically the RENTmaximizer tool, ensuring proper oversight of the automated process.[115]

350.    However, Yardi discourages other Yardi clients to understand how the automation technology works:

> we do not believe it is an efficient use of a person's time to be trained or to have to keep up to date with the technical nuances and options the technology uses to convert the strategic vision into actual pricing action. That is why Yardi supplies a technical specialist who is well-versed in pricing engine technology. We feel that our clients' time is more valuable in making sure the overall pricing activity supports the company's business objectives.[116]

351.    Moreover, Yardi has indirectly affirmed it maintains control over pricing as part of its pricing strategy: "One of the fundamental design elements of the Yardi RENTmaximizer™ revenue management system is to remove the need for human intervention wherever possible. The revenue manager support team has many configuration options at its disposal in order to establish a performance level that meets the strategic objectives for pricing your property."[117]

**F.  Higher Prices for RENTmaximizer Users Confirm Using Defendant Yardi's Products Yield Anticompetitive Effects**

---

[115] Yardi, *Yardi Revenue IQ* (2021), https://resources.yardi.com/documents/revenue-iq-brochure/.

[116] "The RENTmaximizer Pricing System- Establishing an Automated Pricing System." The Balance Sheet – Yardi Corporate Blog, March 15, 2015. https://web.archive.org/web/20210302112741/https://www.yardi.com/blog/uncategorized/the-rentmaximizer-pricing-system/12666.html ).

[117] Yardi, *The RENTmaximizer Pricing System- Establishing an Automated Pricing System,* The Balance Sheet – Yardi Corporate Blog, March 15, 2015. https://web.archive.org/web/20210302112741/https://www.yardi.com/blog/uncategorized/the-rentmaximizer-pricing-system/12666.html.

352.    Following RENTmaximizer's entry, Yardi Client Defendants swiftly, and concertedly, shifted from the previous competitive market share over price strategy to a new collusive price over volume strategy.

353.    A price over volume strategy is a hallmark of pricing in a cartelized market.

354.    Yardi, and Yardi Client Defendants, with their use of RENTmaximizer, have adopted a philosophy of embracing economic occupancy, that is, increasing prices notwithstanding market conditions and tolerating any reduction in physical occupancy those increases might engender.

355.    Upon information and belief, each Yardi Client Defendant implemented significant rental prices increases after beginning their usage of RENTmaximizer.

356.    In fact, Yardi employees have broadcasted RENTmaximizer's unique success in raising rents in certain "markets in which a significant number of properties use Yardi RENTmaximizer."[118]

357.    In May 2014, Yardi analyzed properties on RENTmaximizer from the end of 2012 through April 2014 and compared the aggregate performance of this "same store sales" population against the market.

358.    Yardi's analysis found that "[a]t the end of April 2014, RENTmaximizer properties saw rental rates over 2% above the market" even including "properties using other revenue management software," with "[t]he markets [growing] at a combined rate of 3.9%, while RENTmaximizer properties outperformed the market and grew at nearly 6%".[119]

---

[118] Yardi, *Yardi RENTmaximizer Market Analysis: 2013 Performance Results*, The Balance Sheet: Yardi Corporate Blog (Mar. 1, 2015), https://web.archive.org/web/20210302115856/https://www.yardi.com/blog/uncategorized/yardirentmaximizer-market-analysis/12670.html.
[119] *Id*.

359. Yardi also performed a separate analysis "for some markets in which a significant number of properties use Yardi RENTmaximizer" and found substantial above market gains in many of these:[120]

1. Denver saw a market rental growth of 9.8%, while the RENTmaximizer properties grew by almost 13.5% and RENTmaximizer customers exceeded the market by almost 3.7%.

2. Similarly, the Houston market grew by 8% overall, while RENTmaximizer properties produced 14%—a 6% advantage for RENTmaximizer customers.

3. Comparatively, the market in Orange County, California saw 4.05% growth while RENTmaximizer properties grew by 4.37%.

360. Yardi explained these results likely exceeded the competition only slightly because "many more properties in this market use other revenue management systems," but noted even this small increase above market using RENTmaximizer created a significant income difference.[121]

361. Yardi concluded that the analysis delivered "significant statistical proof that RENTmaximizer produces consistently better results than the market, and our customers tell us that we provide the best support in the industry . . . Yardi RENTmaximizer delivers better results, better service, and complete visibility into the 'health' of your property performance and how it drives your pricing results:"[122]

---

[120] Yardi, *Yardi RENTmaximizer Market Analysis: 2013 Performance Results*, The Balance Sheet: Yardi Corporate Blog (Mar. 1, 2015), https://web.archive.org/web/20210302115856/https://www.yardi.com/blog/uncategorized/yardirentmaximizer-market-analysis/12670.html.

[121] Yardi, *Yardi RENTmaximizer Market Analysis: 2013 Performance Results*, The Balance Sheet: Yardi Corporate Blog (Mar. 1, 2015), https://web.archive.org/web/20210302115856/https://www.yardi.com/blog/uncategorized/yardirentmaximizer-market-analysis/12670.html.

[122] Yardi, *Yardi RENTmaximizer Market Analysis: 2013 Performance Results,* The Balance Sheet: Yardi Corporate Blog (Mar. 1, 2015),

362.    Besides, abundant Yardi Client Defendants have openly acclaimed Yardi allowed them to raise rental rates, eliminate discounts, and "remove uncertainty and fear" otherwise understood as competition from the pricing process.[123]

**G. Defendants' Price-Fixing Scheme Also Harmed Consumers in Other Lease Terms**

363.    The collusion between Yardi and the Yardi Client Defendants harms consumers beyond rental unit pricing rates: Yardi-based price collusion has made short-term leases ubiquitous in Apartment Markets around the country.

364.    Short-term leases are more profitable for Landlords, and the certainty that Yardi's pricing "transparency" brings to Yardi Client Defendants makes long term leases gratuitous because unlike in a competitive market, Yardi Client Defendants will not be blindsided by sudden pricing changes by their competitors.

365.    Additionally, Defendants' unlawful price-fixing scheme maintains occupancy rates by manipulating inventories of available units: Defendants are also able to restrict the availability of units to maintain artificially high lease prices that protect Yardi Client Defendants prices even in down real estate markets from the problems short-term leases might otherwise pose when real estate markets are declining. [124]

366.    The reason for favoring these shorter lease durations and increasing tenant churn is obvious—it allows Landlords to increase rents more frequently.[125]

---

https://web.archive.org/web/20210302115856/https://www.yardi.com/blog/uncategorized/yardirentmaximizer-market-analysis/12670.html.
[123] i.e.¶118; Supra, Note73.
[124] *See* Supra note 82; Supra Note 81; ("It may require a change in mentality, but there are some real opportunities to realize rent gains with the use of a revenue management solution,").
[125] *See Banyan Living Achieves Rent Growth with Yardi RENTmaximizer*, Business Wire (December 13, 2016); https://www.businesswire.com/news/home/20161213005313/en/Banyan-Living-Achieves-Rent-Growth-with-Yardi-RENTmaximizer

367.    The Bureau of Labor Statistics ("BLS") reports that in the first half of 2022, the average percentage change in rent was 12% for new tenants, but only 3.5% for renewing tenants (i.e., tenants who had a lease renewal within the previous six months). [126]

368.    Understanding Yardi's actions also assists in explaining trends.

369.    The BLS reports that leases of longer than one year have virtually disappeared.

370.    Of all leases between January and June 2022, less than 9% were longer than one year.

371.    And even one-year leases become less common the longer a tenant lives in an Apartment.

372.    The BLS reports that of the tenants who lived in the same unit for five or more years, only 49.7% had a twelve-month lease, while 50.3% had month-to-month leases, meaning 0% (allowing for rounding) had leases for a period longer than twelve months.

**H.  Defendants' Conduct Offers No Pro-Competitive Benefits**

373.    Defendants rent pricing scheme has not benefited competition.

374.    It has also not had pro-competitive effects in the multifamily housing rental market.

375.    Instead, widespread adoption of RENTmaximizer has distorted the multifamily rental market: Defendants conduct has had the effect of benefiting them by increasing revenues and profits; meanwhile, consumers have subsidized this misconduct by paying artificially inflated prices for their rent.

---

[126] U.S. Bureau of Labor Statistics, Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUUR0000SEHA], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfe d.org/series/CUUR0000SEHA, May 3, 2024.

376.    Defendants' misconduct has made it more arduous for consumers to discern and procure meaningfully less expensive rental rates for comparable multifamily rental properties offered by Defendants' co-conspirators.

377.    Assuming any procompetitive benefits from Defendants' misconduct exist, they would be minimal in nature and could not outweigh the substantial and anticompetitive effects of this misconduct.

### I.    Defendants' Other Means Engaged to Advance Anticompetitive Strategy

378.    Sharing confidential pricing information with a common pricing agent can be equivalent to sharing that information directly with a competitor.

379.    Where, as here, Plaintiffs' allegations involve a conspiracy to centralize pricing decisions in a third-party algorithm, it is irrelevant to the scheme whether landlords share confidential information among themselves or with only the pricing agent; the alleged scheme is designed to obviate the need for competitors to share information directly with each other.[127]

380.    Even so, upon information and belief, Yardi actively creates and supports "User Groups" made up of Yardi Client Defendants that Yardi uses to refine and perfect their unlawful collusion.[128]

381.    Yardi advises these User Groups are opportunities to exchange information and ideas, and advances uniform and focused input to Yardi's software developers.[129]

382.    Yardi enables these User Groups by connecting Yardi Client Defendants to existing user groups for membership and/or connect interested local parties so to form a user group.

---

[127] *See* Statement of Interest of the United States, *Duffy v. Yardi Systems Inc. et al.,* case number 2:23-cv-01391, in the U.S. District Court for the Western District of Washington.

[128]            Yardi,              "*Community              Support*"              (2023)" https://web.archive.org/web/20230311055157/https://www.yardi.com/services/user-groups.

[129] *Id.*

383.    Yardi software users include Yardi Client Defendants and Yardi's software is central to effecting collusion between Defendants.

384.    Yardi's corporate office maintains control over the user groups as the point of contact for all user groups, despite their insistence the user groups are conducted by Yardi software users' members exclusively.[130]

385.    Thus, Yardi promoted opportunities for direct feedback from their conspirators so to perfect their mechanism of collusion during the same time as the primary parallel conduct between Defendants.[131]

386.    Yardi's support of these user groups and Yardi Client Defendants' participation in the groups to further share competitively sensitive information is inconsistent with Yardi Client Defendants acting unilaterally in competition with each other and serves as commanding evidence that the Defendants are coordinating and colluding, not competing.

**J.  Parallel Conduct and "Plus Factors" Exclude the Possibility of Independent Action**

387.    Defendants' actions to collude in the Multifamily Rental Market were dependent and motivated by an intent to undermine competition advancing an anticompetitive strategy, and so far evidenced by Defendants' engagement in multiple forms of parallel conduct including (1) entering into agreements to use RENTmaximizer and using RENTmaximizer during the same periods of time; (2) each using pricing adjustments provided by Yardi's RENTmaximizer with the understanding that usage would produce artificially inflated prices; (3) each sharing sensitive competitive pricing and occupancy data with Yardi with the understanding and expectation that

---

[130] *Id.*
[131] In 2023, Defendant Yardi's website published supported approximately 17 User Groups in in at least 11 states,[131] but as of May 2024, Yardi has hidden the existence of the User Groups. Compare https://www.yardi.com/services/user-groups (last accessed May 6, 2024).

providing the information would contribute to artificially inflated prices; and (4) each implementing significant rental price increases after beginning their usage of RENTmaximizer.

388.    The multifamily real estate rental market has numerous "plus" factors that cause the industry to be vulnerable to collusion and creates an environment that is not hospitable to independent action.

389.    The "plus factors" include (a) high barriers to entry into the market; (b) high barriers to exit; (c) inelastic consumer demand; (d) market concentration; (e) the dissemination of competitively sensitive information; (f) the availability for the opportunity to collude at trade associations; and (g) actions that are against economic self-interest.

**1.  High Barriers to Entry into the Market**

390.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.

391.    Where, however, there are significant barriers to entry, new entrants are less likely to enter the market.

392.    Thus, entry barriers help facilitate the formation and maintenance of a collusion.

393.    Such is the case here.

394.    Multifamily residential real estate property owners and operators face significant entry barriers, such as high maintenance costs, regulatory compliance, high acquisition costs, labor costs, high construction costs, and high cost of acquiring property and establishing a property management infrastructure.

395.    Even small multifamily rental properties cost millions of dollars to acquire.

396.    Large properties run into the hundreds of millions of dollars to own and manage.

397.    They take several years and significant experience to build or acquire.

398.    As a result, the multifamily leasing market is less attractive to new entrants, businesses who just entered the market are less likely to be able to discipline cartel pricing.

399.    In addition to building and acquisition costs, developing and maintaining a multifamily rental housing property takes years.  Thus, new entrants into the residential real estate leasing market are unlikely to ameliorate collusive pricing.

**2.  High Barriers to Exit out of the Market.**

400.    It is nearly impossible for renters to discipline cartel pricing due to high exit barriers in this market.

401.    Renters incur substantial cost and inconvenience when moving and, where price escalation is occurring in broad geographic areas, they might not have a lower priced option in reasonable proximity to where they currently live or work.

**3.  Inelastic Consumer Demand**

402.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.

403.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.

404.    Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether.

405.    Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

406.    The demand for multifamily residential property leases is inelastic.

407.    First, in most cases, renters choose their place to live based on proximity to community and lifestyle activities, workplace, or school and decide to live in those locations despite price increases.

408.    Second, the only realistic alternative to renting is buying, which is seldom an option for renters who do not usually have the liquid capital to do so on short notice.

409.    Finally, multifamily residential unit rental properties are susceptible to standardization and are fungible.

410.    This is especially true here when the competitively sensitive information Yardi Client Defendants share with Yardi that is incorporated into RENTmaximizer is specific to unit type, size, location, and lease length, the fact that multifamily property generally has various characteristics does not impede on the ability of Yardi Client Defendants to coordinate rents through RENTmaximizer.

411.    Thus, there are no reasonable substitutes to discipline cartel pricing.

### 4.  Market Concentration

412.    A highly concentrated market is more susceptible to collusion and other anticompetitive practices.

413.    Yardi dominates the property management software market, and Yardi Client Defendants dominate the multifamily residential properties market in areas throughout the State of Georgia and across the United States.

414.    Taken together, the landlords hold a staggering market share of multifamily residential property leases in this country.

415.    The market for residential real estate property leases is highly concentrated, with landlords and other smaller participants ferociously acquiring any emerging players in the market.

416.    Most major metropolitan areas in the state are dominated by relatively few property managers, with many large corporations like RAM having substantial presences in metropolitan areas throughout Georgia.

**5.    Dissemination of Competitively Sensitive Information**

417.    Yardi Client Defendants all agreed to submit their confidential business information to Yardi RENTmaximizer with the knowledge that the system would use that data to calculate rents for their competitors.

418.    Such an agreement of mutual sharing and receiving competitors' information makes sense for Yardi Client Defendants only if they are assured that their competitors will not use the information provided to gain competitive advantage, i.e., lure renters away through reduced rents.

419.    This agreement of mutual sharing and receiving competitors' information benefits the property managers and owners only if their competitors do not use the information to gain a competitive advantage, i.e., offer reduced rents to renters.

**6.    Availability For the Opportunity to Collude at Trade Associations, Etc.**

420.    Yardi Client Defendants and Yardi have numerous opportunities to collude at the Yardi Advanced Solutions Conferences (YASC) and social events.

421.    YASC is a large-scale, well-attended social event exclusive to Yardi and its clients.[132]

422.    Upon information and belief, YASC is attended by about 2,000 people each event, who pay approximately $1,195.00 to participate.

423.    The convention includes "exclusive entertainment and fun social events."

---

[132] YASC, YARDI.COM, https://www.yardi.com/yasc/north-america/

424.    The agenda includes a two-hour lunch, a "Networking Reception," and a four hour "Yardi Party."

425.    During the 2023 YASC, Yardi "classes" include "Revenue IQ: Overview" which is intended for "current Revenue IQ clients and others interested in growing their revenue" and another titled "Revenue IQ: Introduction" which is intended for "[c]lients interested in an initial introduction to Yardi's revenue management offering[.]"[133]

426.    In other words, Yardi uses YASC to introduce and sell Revenue IQ to attendants.

427.    Since it first developed RENTmaximizer, Yardi has presented sessions and classes at prior YASC's in the past to introduce and sell RENTmaximizer to attendants.

428.    For example, on November 8, 2017, Defendant Alco, a user of RENTmaximizer, recounted a panel at the 2017 YASC:

> On the panel were Dana Patterson, director of asset management at ALCO Management, Maria Braun, ERP business analyst at Bigos Management and Lisa Friedman, database coordinator at HCA Management Services. Aaron Wells, the Yardi client services team leader for BI, moderated.
> ***
>  Patterson explained that ALCO also used Yardi RENTmaximizer for revenue management, Yardi Payment Processing for electronic transactions and RentCafé for marketing, leasing and online resident services. The addition of Orion to its Voyager platform combines all of that operational and ancillary services data to deliver powerful analytics across its portfolio.[134]

429.    Additionally, Yardi Defendants' employee Client Managers and Yardi have opportunity to collude through Yardi's coordination of "User Groups" across the nation, as discussed previously.

---

[133] Class Descriptions, YASC 2023, 21, https://resources.yardi.com/documents/yasc-class-descriptions/ (emphasis supplied).
[134] The Benefits of BI, ALCO MANAGEMENT (Nov. 8, 2017), https://www.alcomgt.com/blog/2017/11/08/the-benefits-of-bi/

430.    Once Landlords join the conspiracy Yardi organizes local and regional meetings at which it encourages Landlords to refine and improve their collusion.

431.    To "facilitate the exchange of information" among Landlords, "Yardi encourages the development of active local User Groups."

432.    Yardi advised on their website that these User Groups help exchange information, experiences, and ideas. Tellingly, Yardi hides from public scrutiny the names of the Yardi Client Defendants' landlords that are members of these User Groups as well as the time and location of the groups' meetings.

### 7. Actions Against Economic Self-Interest

433.    Defendants' pricing strategy—dramatically increasing rents notwithstanding market conditions—is irrational and against self-interest in a competitive market.

434.    In the absence of changes in demand, no rational property managers would act alone to raise rents as they did here during the class period, because any empty units exceeding the competitive market price would be left vacant as potential renters would fill vacancies at competitors' properties who offer lower prices.

435.    First, the Yardi Client Defendants submit their competitively sensitive pricing data to Yardi knowing that all the Yardi Client Defendants are doing the same and that Yardi would use that data to coordinate leasing prices among them.

436.    Yardi Client Defendants all agreed to submit their confidential business information to Yardi and for use by the Yardi RENTmaximizer database with the knowledge that the algorithmic tool would use that data to calculate rents for their competitors.

437.    Yardi Client Defendants' agreement of mutual sharing and receiving competitors' information only makes sense if they are assured that their competitors will not use the information

provided to gain competitive advantage and instead will engage in the same anticompetitive actions.

438.    This coordination is inconsistent with independent action motivated by an intent to compete, which would drive Landlords to zealously protect this competitively sensitive information from their competitors.

439.    Second, the Landlords' agreement not to compete on price is against their self-interest in a competitive market.

440.    Landlords acting independently and motivated to compete for renters would use lower prices to entice renters and increase occupancy rates; that is the very essence of pricing in a competitive market.

441.    Thus, the Landlords' conduct is inconsistent with a conclusion that they are acting independently to compete more effectively. Defendants' deceptive practices, which were fraudulent, unlawful, against public policy, unscrupulous, and unfair to consumers like Plaintiff and members of the Class in this action.

442.    As a result of Defendants' actions, Plaintiffs and members of the class suffered substantial damages including out-of-pocket losses and seek to recover all available monetary and equitable relief.

### K.  Conspiracy to Fix Prices in the Relevant Market

443.    Defendants' actions described herein constitute a single unlawful conspiracy to fix, raise, stabilize, or maintain the nationwide multifamily rental prices at artificially high levels, and is *per se* illegal under the Sherman Act.

444.    This agreement was evidenced by Yardi Client Defendants' reciprocal exchange of competitively sensitive information through Yardi and outsourced their independent price decisions to a common decision maker.

445.    Because of the horizontal nature of the alleged conspiracy, and because the conduct alleged here increased prices and reduced output, if the Court declines to analyze this case under the *per se* rule, the Court could conduct a "quick look" review.

446.    Under either mode of analysis, Plaintiffs are not required to prove that Defendants had market power in any defined antitrust market.

447.    To the extent the Court decides to engage in the rule of reason analysis, the relevant product market is the multifamily housing rental market, and the relevant geographic market is the United States.

448.    Consumers do not consider housing available for purchase as substitutes for multifamily rental apartment units because, among other reasons, purchase of real estate requires a substantial financial investment for a down payment that often requires financing.

449.    In addition, the short-term nature of leases is not equivalent to long-term permanent purchasing.

450.    Nor is single-family real estate considered an economic substitute for multifamily residential real estate, because of amenities, security, and availability.

451.    The multifamily rental market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test."

452.    The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist.

453.    If the SSNIP is profitable, the market is properly defined.

454.    If the SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

455.    Here, the SSNIP test is satisfied, and the market is properly defined.

456.    As described above, pursuant to the Yardi Client Defendants' agreement not to compete on price, Yardi Client Defendants are able to gain (according to Yardi) "on average more than 6% net rental income growth," those increases have not driven enough renters out of the market such that the SSNIP has become unprofitable to Yardi Client Defendants.

457.    On information and belief, RENTmaximizer is today widely used throughout the United States by Yardi Client Defendants to set multifamily rental prices.[135]

### L.  Defendants Fraudulently Conceal their Price Fixing Scheme

458.    Defendants fraudulently and actively concealed their price-fixing scheme in which they shared confidential pricing and information by and through RENTmaximizer.

459.    Defendants undertook affirmative acts to hide their misconduct, including each Yardi Client Defendant entering into a contract with Yardi to maintain any information disclosed through their relationship as confidential.

460.     On January 31, 2014, Tribridge entered into a contract with Yardi, which included a license to use RENTmaximizer.

461.    The contract between Tribridge and Yardi is confidential, such that it was not shared with Plaintiffs or Class members.

---

[135]  Patrick Nelson, *Algorithms for Rent: The Price is Right, Tech News World* (Mar. 12, 2013), https://www.technewsworld.com/story/algorithms-for-rent-the-price-is-right-77498.html.    ("In    2013, RENTmaximizer was used to price 8 million residential units around the world."); *See Yardi, Yardi RENTmaximizer Market Analysis: 2013 Performance Results,* The Balance Sheet: Yardi Corporate Blog (Mar. 1, 2015), https://web.archive.org/web/20210302115856/https://www.yardi.com/blog/uncategorized/yardirentmaximizer-market-analysis/12670.html. ("Yardi RENTmaximizer was quickly adopted by Yardi clients from the beginning" and that "its adoption rate continues to grow exponentially.").

462.    The contract between Tribridge and Yardi defined "Confidential Information" to include the terms of the contract as well as "any other information disclosed by a party, or to which a party is exposed because of this Agreement that the disclosing party Identifies as confidential at the time of disclosure or which — by its nature - reasonably should be regarded as confidential."

463.    The contract between Tribridge and Yardi also includes a nondisclosure provision such that any "Confidential Information" would not be disclosed to third-parties, including Plaintiffs and the Class.[136]

464.    As such, the entire nature of the relationship between Yardi and Tribridge was concealed from Plaintiffs and the Class, including that Tribridge shared confidential information to Yardi to receive ultracompetitive rental pricing that was determined using other Yardi Client Defendants' confidential information.

465.    The purpose of Defendants' concealment of its price-fixing scheme was to continue to profit from the increased rental pricing determined by RENTmaximizer and to prevent Plaintiffs and other Class members from seeking redress.

466.    Plaintiffs and Class members neither knew nor, in the exercise of due diligence, would have reasonably known that Defendants were sharing confidential information as part of a rental price-fixing conspiracy.

467.    Any applicable statute of limitations has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing. To this day, Defendants continue to deny the existence of a price-fixing conspiracy.

## **CLASS ACTION ALLEGATIONS**

---

[136] The contract does, however, allow Yardi to use the Confidential Information, to perform its obligations under the contract, including providing rental pricing using RENTmaximizer.

468.    Plaintiffs bring this action on behalf of themselves and as representative of all

others similarly situated. Pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and (c)(4) of the Federal

Rules of Civil Procedure, Plaintiffs seek certification of the following Nationwide Class:

> All persons and entities in the United States that leased multifamily housing
> in the United States from a Defendant or from a division, subsidiary,
> predecessor, agent, or affiliate of such Defendant, that utilized Yardi
> Systems, Inc.'s, market intelligence tools, integrated technological services,
> and         revenue         management         solutions,         explicitly         the
> RENTmaximizer/Revenue IQ product at any time during the period of
> January 31, 2014, until the Defendants' unlawful conduct and its
> anticompetitive effects cease to persist.

469.    Plaintiff Beevers additionally seeks certification of the following Colorado Class

pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and (c)(4) of the Federal Rules of Civil Procedure with

respect to COUNT VI (Violation of the Colorado Antitrust Act, C.R.S. § 6-4-1):

> All persons and entities in the State of Colorado that leased multifamily
> housing in the State of Colorado from a Defendant or from a division,
> subsidiary, predecessor, agent, or affiliate of such Defendant, that utilized
> Yardi Systems, Inc.'s, market intelligence tools, integrated technological
> services,   and   revenue   management   solutions,   explicitly   the
> RENTmaximizer/Revenue IQ product at any time during the period of
> September 8, 2019, until the Defendants' unlawful conduct and its
> anticompetitive effects cease to persist.

470.    For purposes of the above class definitions, "market intelligence tools, integrated

technological services, and revenue management solutions" include any products sold by Yardi to

any Defendant in which the product's function and/or algorithmic output to recommend pricing

for each rental unit is facilitated by exploiting Yardi Client Defendants' sensitive pricing and

supply data for intermingled analysis.

471.    Excluded from the Class are Defendants and their officers and directors,

governmental entities, Plaintiffs' counsel, and the members of the judiciary and their staff to whom

this case is assigned and their immediate families.  Plaintiffs reserve the right to revise the Class

definition, as appropriate, during this litigation.

472.    The cumulation of Yardi's client's sensitive data affects the opportunity for horizontal competitors to conspire to fix prices in their respective rental housing markets.

473.    **Numerosity:** The members of the Class are so numerous and geographically dispersed that individual joinder of all class members would be impracticable.  The exact number of Class members as of the date of filing is currently unknown to Plaintiffs but may be readily identified and ascertained from the books and records maintained by Defendants. Individual joinder of the members of the proposed Class and Subclass are impracticable because the members of the Class and Subclass are in the tens or hundreds of thousands.

474.    To a reasonable degree of certainty, the Defendants have objective evidence as to the identity of each Class Member, the damages suffered by each Class Member, including but not limited to rental agreements, payment information, receipts, and other information that objectively identifies class members.

475.    The use of mail, publication, and through records of Defendants would allow for notification to Class Members regarding the pendency of this action.

476.    **Typicality:** The Plaintiffs' claims are typical of the claims of the proposed Class because the Plaintiffs and Class Members were harmed in the same manner by the same conduct. Plaintiffs and the other Class Members suffered damages as a direct and proximate result of these same wrongful practices by Defendants.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class Members' claims.

477.    Plaintiffs and Class Members have all sustained economic injury arising from the Defendants' violations of common and statutory law as alleged in this complaint.

478.    **Adequacy:** Plaintiffs will fairly and adequately protect and represent the interests of the Class.

479.    Plaintiffs' interests do not conflict with the interests of the Class and Subclass that they seek to represent. Plaintiffs will fairly and adequately protect the interests of the absent members of the Class. Because their claims are typical of those of absent members of the Class, Plaintiffs have every incentive to vigorously pursue those claims on behalf of absent Class members, and their interests coincide with, and are not antagonistic to, those of the Class. Rather, Plaintiffs share the same interest as Class members in putting an end to Defendants' conduct.

480.    Plaintiffs have retained competent counsel who are experienced in prosecuting class actions, and the Plaintiffs intend to prosecute this action actively.

481.    Plaintiffs and members of the Class are represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.

482.    **Commonality and Predominance:** Plaintiffs and members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more for leases than they otherwise would have in a competitive market.

483.    This Complaint includes common questions of law and fact that affect Plaintiffs and Class Members. Resolution of these questions will not require individual inquiry into the actions or circumstances of individual Class Members and can be answered with evidence common to all members of the Class.

484.    This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members and which can be answered using evidence common to the Class.

485.    Questions of law and fact common to the Class include:

a.   Whether Defendants entered into a formal or informal contract, combination, conspiracy, or common understanding to artificially inflate the price and/or artificially suppress the supply of multifamily housing real estate leases;

b.   whether, in furtherance of the alleged formal or informal contract, combination, conspiracy, or common understanding, the Defendants' exchanged or shared what would otherwise be confidential information;

c.   whether such conduct violates Section 1 of the Sherman Act under the per se, quick look, or rule of reason modes of analysis;

d.   whether such conduct has in fact artificially inflated prices and/or artificially suppressed supply of multifamily housing real estate leases from competitive levels;

e.   The proper measure of damages; and

f.   What appropriate injunctive relief would accurately remediate the Defendants' anticompetitive actions to prevent the same or similar conduct in the future.

486.   The requirements of Fed. R. Civ. P. 23 (b)(3) are satisfied in that, as set forth above, prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants.

487.   Adjudications with respect to individual members of the Class would as a practical matter be dispositive of the interests of the other members not parties to the adjudications and would substantially impair or impede their ability to protect their interests.

488.   All Class Members would benefit from the relief requested herein.

489.    **Superiority:** The class mechanism is the superior method to all other available methods for the fair and efficient adjudication of these claims for the Plaintiffs, Class Members, and Subclass Members.

490.    As the individual damages in this case are likely to be relatively small, individual litigation is not practicable.

491.    Additionally, it is unlikely that individual Class Members will want to undertake the burden and expenses of an individual case.

492.    Further, utilization of individualized litigation would increase the delay and expense to the parties, and would exasperate the burden on the judicial system, and could also lead to inconsistent or contradictory judgments.

493.    The class action device would allow for fewer management difficulties, would allow for singular adjudication, economy of scales, and comprehensive supervision by a single court.

494.    Questions of law and fact common to all Class Members predominate over any questions that would affect only individual Class Members.

495.    In each instance, the injuries sustained by Plaintiffs and Class Members flow from a common nucleus of the operative facts.

496.    The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

497.    All Class members would benefit from the injunctive relief requested herein. Additionally, Defendants have acted and/or refused to act on grounds generally applicable to the

class, thereby making appropriate final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.

## CAUSES OF ACTION

## I.    VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR AGREEMENT IN RESTRAINT OF TRADE (HUB AND SPOKE CONSPIRACY)

### 15 U.S.C. § 1 (On Behalf of Nationwide Class for Injunctive and Equitable Relief and Compensatory Damages)

498.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in paragraphs 1-497 of this Complaint.

499.    Beginning in 2011, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

500.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to use Yardi's pricing algorithms to artificially inflate price in the nationwide market for multifamily rental housing.

501.    This combination, generally known in antitrust law as a hub and spoke conspiracy, consists of a combination of (1) a set of vertical agreements between Yardi Client Defendants and Yardi that implement Yardi's revenue management program and (2) a horizontal agreement amongst all Defendants to use Yardi's revenue management program.

502.    The contract, combination, or conspiracy alleged herein has caused Plaintiffs and Class members to suffer overcharge damages.

503.    There are no procompetitive justifications for the Defendants' cartel, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

504.    Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act.

505.    In the alternative, Defendants' conspiracy violates section 1 of the Sherman Act under either a quick look or rule of reason analysis.

## II.    VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR AGREEMENT IN RESTRAINT OF TRADE (SET OF VERTICAL AGREEMENTS)

### 15 U.S.C. § 1 (On Behalf of Nationwide Class for Injunctive and Equitable Relief and Compensatory Damages)

506.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in paragraphs 1-497 of this Complaint.

507.    Beginning in 2011, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

508.    The contract, combination, or conspiracy alleged herein has consisted of a set of vertical agreements between Yardi Client Defendants and Yardi for each Yardi Client Defendants to use Yardi's pricing algorithms to set prices for multifamily rental housing.

509.    Sets of vertical agreements are actionable as an overall combination under antitrust law and are analyzed under the rule of reason.

510.    Each individual agreement between a Yardi Client Defendant and Yardi in isolation had the anticompetitive effect of artificially inflating prices for multifamily rental housing for that Yardi Client Defendant.

511.    In the aggregate, the set of vertical agreements between Yardi Client Defendants and Yardi artificially inflated prices in the relevant market of multifamily rental housing in the United States.

512.    In particular, as a result of the vertical agreements, competitor Yardi Client Defendants each delegated pricing to a centralized third party, Yardi, with the understanding that Yardi revenue management software would inflate the rents that they collectively charged.

513.    The contract, combination, or conspiracy alleged herein has caused Plaintiffs and Class members to suffer overcharge damages.

514.    There are no procompetitive justifications for the Defendants' cartel, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

515.    Defendants' conspiracy violates section 1 of the Sherman Act under either a quick look or rule of reason analysis.

### III.    VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION

**15 U.S.C. § 1 (On Behalf of Nationwide Class for Injunctive and Equitable Relief and Compensatory Damages)**

516.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in paragraphs 1-497 of this Complaint.

517.    Beginning in 2011, Defendants and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and nonpublic information about their operations.

518.    This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

519.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

520.    Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for multifamily real estate leases.

521.    The relevant product market is the market for the lease of multifamily real estate and the relevant geographic market is nationwide.

522.    Defendants possess market power in the relevant antitrust market.

523.    Defendants could impose an increase in the price of leases collectively without causing many consumers to switch their purchases to another lease.

524.    Leases constitute a unique product market.

525.    The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive, and non-public information about current supply, production, and pricing plans regarding leasing.

526.    Defendants' regular information exchanges through Yardi reflected concerted action between horizontal competitors in the market for leases.

527.    Yardi Client Defendants understood and intended that the information they provided would be incorporated into Yardi Matrix and also used, in aggregated fashion, to provide pricing recommendations through RENTmaximizer.

528.    Each Defendant furnished competitively sensitive information to other leasing companies with the understanding that it would be reciprocated in the form of pricing recommendations that utilized that data.

529.    These reciprocal exchanges of information between Defendants constituted a horizontal exchange of information.

530.    The collective agreement to regularly exchange detailed and non-public information about current production, supply, and pricing of leases suppressed competition between the Defendants.

531.    When Defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price.

532.    Accordingly, Defendants used the data obtained through Yardi's RENTmaximizer to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the leasing market.

533.    This strategic information was a material factor in Defendants' decisions to inflate the prices that Plaintiffs and Class members paid for leases during the Class Period.

534.    Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose.

535.    The information exchanged between Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

536.    The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Defendants in the nationwide multifamily market, and (2) inflating the prices of leases during the Class Period.

537.    As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been harmed by being forced to pay inflated prices for leases.

538.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class have been injured in their business or property and will continue to be

injured in their business and property by paying more for leases than they would have paid and will pay in the absence of the conspiracy.

539.    This horizonal agreement to exchange information constitutes a violation of Section 1 of the Sherman Act under a rule of reason analysis.

## VI.    VIOLATION OF THE COLORADO ANTITRUST ACT

### C.R.S. § 6-4-1 (On Behalf of the Colorado Class for Injunctive and Equitable Relief and Compensatory Damages)

540.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in paragraphs 1-497 of this Complaint.

541.    Defendants are direct, horizontal competitors within the multifamily rental market in the state of Colorado, and throughout the United States.

542.    Beginning in 2011, Defendants and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and nonpublic information about their operations.

543.    This agreement is an unreasonable restraint of trade in violation of § 6-4-104 of the Colorado Antitrust Act.

544.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

545.    Defendants' anticompetitive acts involved the State of Colorado and United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for multifamily real estate leases.

546.    The relevant product market is the market for the lease of multifamily real estate and the relevant geographic market includes and impacts the State of Colorado, as well as being impacted nationwide.

547.    Defendants possess market power in the relevant antitrust market.

548.    Defendants could impose an increase in the price of leases collectively without causing many consumers to switch their purchases to another lease.

549.    Leases constitute a unique product market.

550.    The information regularly exchanged by Defendants pursuant to the agreement consisted of detailed, competitively sensitive, and non-public information about current supply, production, and pricing plans regarding leasing.

551.    Defendants' regular information exchanges through Yardi reflected concerted action between horizontal competitors in the market for leases.

552.    Yardi Client Defendants understood and intended that the information they provided would be incorporated into Yardi Voyager, Yardi Matrix and also used, in aggregated fashion, to provide pricing recommendations through RENTmaximizer.

553.    Each Defendant furnished competitively sensitive information to other leasing companies with the understanding that it would be reciprocated in the form of pricing recommendations that utilized that data.

554.    These reciprocal exchanges of information between Defendants constituted a horizontal exchange of information.

555.    The collective agreement to regularly exchange detailed and non-public information about current production, supply, and pricing of leases suppressed competition between the Defendants.

556.    When Defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price.

557.    Accordingly, Defendants used the data obtained through Yardi's RENTmaximizer to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the leasing market.

558.    This strategic information was a material factor in Defendants' decisions to inflate the prices that Plaintiffs and Class members paid for leases during the Class Period.

559.    Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose.

560.    The information exchanged between Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

561.    The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Defendants in the nationwide multifamily market, and (2) inflating the prices of leases during the Class Period.

562.    As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been harmed by being forced to pay inflated prices for leases.

563.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for leases than they would have paid and will pay in the absence of the conspiracy.

564.    This horizonal agreement to exchange information constitutes a violation of § 6-4-104 of the Colorado Antirust Act.

565.    The acts and conduct of Defendants, as hereinbefore alleged, constitute violations of the Colorado Antitrust Act, C.R.S. § 6-4-105, which provides: "It is illegal for any person to monopolize, attempt to monopolize, or combine or conspire with any other person to monopolize any part of trade or commerce."

566.    As the direct and proximate cause of Defendants' violations of the Colorado Antitrust Act, Plaintiffs have been damaged.

567.    As the direct and proximate cause of Yardi Defendants' violations of the Colorado Antitrust Act, competition in the multifamily rental market in the State of Colorado has been injured.

568.    Plaintiffs are therefore entitled to an award of damages they have sustained as the result of Defendants' anticompetitive conduct, the exact amount of which shall be proven at trial.

Pursuant to C.R.S. § 6-4-115, Plaintiffs are entitled to an award of their actual damages for its violation, treble the amount of actual damages sustained as the result of Defendants' anticompetitive conduct, together with their attorneys' fees and costs and any such other relief as the Court deems just and proper.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully request judgment against Defendants as follows:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.     The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

C.     The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed in violation of the Colorado Antitrust Act;

D.     Plaintiffs and the Nationwide Class recover damages, to the maximum extent allowed under the applicable laws, and that joint and several judgments in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit.

E.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.     Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.     Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.     Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: November 6, 2024

By: *Paul W. Evans*
W. Daniel "Dee" Miles, III (*pro hac vice*)
Alison D. Hawthorne (Bar ID #652795)
Lauren E. Miles (*pro hac vice*)
Paul W. Evans (*pro hac vice*)
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
(334) 269-2343
Dee.Miles@beasleyallen.com
Alison.Hawthorne@beasleyallen.com
Lauren.Miles@beasleyallen.com
Paul.Evans@beasleyallen.com

Rebecca D. Gilliland (*pro hac vice*)
Jessica M. Haynes (*pro hac vice*)
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
301 St. Louis St.
Mobile, Alabama 36602
(251) 308-1515
Rebecca.Gilliland@beasleyallen.com
Jessica.Haynes@beasleyallen.com

Michael W. Slocumb (Bar ID #146170)
Charles W. Beene (*pro hac vice*)
**Slocumb Law Firm, LLC**
1967 East Samford Avenue
Auburn, AL 36830
mike@slocumblaw.com
cbeene@slocumblaw.com